**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOHN DOE #1; JUAN RAMON
MORALES; JANE DOE, # 2; IRIS
ANGELINA CASTRO; BLAKE DOE;
BRENDA VILLARRUEL; LATINO
NETWORK; JANE DOE, # 3; GABINO
SORIANO CASTELLANOS,
*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, in his official
capacity as President of the United
States; U.S. DEPARTMENT OF
HOMELAND SECURITY; CHAD F.
WOLF, Secretary, U.S. Department
of Homeland Security; U.S.
DEPARTMENT OF HEALTH & HUMAN
SERVICES; ALEX M. AZAR II,
Secretary of Health and Human
Services; U.S. DEPARTMENT OF
STATE; MICHAEL POMPEO, Secretary
of State, in his official capacity;
UNITED STATES OF AMERICA,
*Defendants-Appellants*.

No. 19-36020

D.C. No.
3:19-cv-01743-SI

ORDER

Filed May 4, 2020

Before:  Sidney R. Thomas, Chief Judge, and Marsha S.
Berzon and Daniel A. Bress, Circuit Judges.

Order by Chief Judge Thomas;
Dissent by Judge Bress

**SUMMARY**[*]

**Immigration / Preliminary Injunction**

The panel denied the government's motion for a stay pending appeal of the district court's preliminary injunction enjoining Presidential Proclamation No. 9945, *Suspension of Entry of Immigrants Who Will Financially Burden the United States Health Care System*.

Issued on October 4, 2019, the Proclamation barred, with some exceptions, individuals seeking to enter the United States on an immigrant visa from entering unless they could demonstrate that they will be covered by certain approved health insurance within 30 days of entry or that they have the resources to cover foreseeable healthcare costs. Individual Plaintiffs are seven U.S. citizens who are sponsoring family members for immigrant visas and whose applicant family members have successfully completed the traditional steps for obtaining an immigrant visa, but would be barred from entering the United States under the Proclamation.  The

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

organizational Plaintiff provides programs aimed at educating and empowering a community of Latinos in Oregon and provides services to navigate the immigrant visa process.

First, the panel concluded that the government failed to meet its burden of showing irreparable harm absent a stay, explaining that: 1) the government's perceived institutional injury is not "irreparable" because the government may yet vindicate its interests in this litigation; 2) the government's claim of harm in the form of costs to healthcare providers and taxpayers by uninsured immigrants was not supported by the record, and the court was not required to accept the Proclamation's conclusory findings as true; and 3) the harm asserted by the government is purely monetary, and such injury is not normally considered irreparable.

The panel also concluded that the record amply supported the district court's conclusion that Plaintiffs would suffer irreparable harm absent preliminary injunctive relief. The panel explained that, based on findings that Plaintiffs and 60% of visa applicants would be unable to satisfy the requirements of the Proclamation, the district court concluded that the Proclamation would result in prolonged separation from family members, a factor that this court has held constitutes sufficient irreparable harm.

The panel noted that its analysis could conclude here, given that if a stay applicant cannot show irreparable harm, a stay may not issue, regardless of the petitioner's proof regarding the other stay factors, but concluded that the context of this case suggested that the panel should proceed with examining the remaining factors.

Second, the panel concluded that the government had not met the high standard of showing a strong likelihood of success on the merits. In doing so, the panel observed that, as a motions panel, it must take care not to prejudge the merits of the appeal, but rather to assess the posture of the case in the context of the necessity of a stay pending presentation to a merits panel. Further, the panel concluded that the government had not shown a strong likelihood of success on Plaintiffs' claim that the Proclamation conflicts with the Violence Against Women Act's amendments to the Immigration and Nationality Act ("INA"), the Affordable Care Act, and the "public charge" provision of the INA.

The panel also considered 8 U.S.C. § 1182(f), the section of the INA that provides that the President may, under certain circumstances, "for such a period as he shall deem necessary, suspend the entry of all aliens or any class of aliens . . . or impose on the entry of aliens any restrictions he may deem to be appropriate." The panel acknowledged that the President is owed broad deference with respect to this provision, but nonetheless concluded at this juncture, for two reasons, that the Plaintiffs are likely to succeed in refuting the government's contention that § 1182(f) legitimizes the Proclamation: 1) the Proclamation's perfunctory time limitations do not comport with the textual limits of § 1182(f); and 2) § 1182(f) does not provide the President with limitless power to deny visas to immigrants based on purely long-term economic concerns.

Third, the panel concluded that a stay would substantially injure Plaintiffs, as well other parties, including Twenty-one states, the District of Columbia, and the City of New York, all of which filed amici briefing describing the significant harm

they and other governmental entities will suffer if the Proclamation goes into effect.

Fourth, the panel concluded that the public interest lies with maintaining the *status quo* while the appeal is pending, explaining that for countless decades, a stable immigration system has provided for families to be united through a visa system that did not require purchase of selected insurance products. Given the irreparable harm to the Plaintiffs, the lack of irreparable harm to the United States for maintaining the *status quo* pending resolution of this appeal, and the injury to other parties if the Proclamation is immediately implemented, the panel concluded that the public interest favors preserving the *status quo*.

Finally, the panel concluded that the district court did not abuse its discretion in entering a nationwide injunction. The panel noted that, subsequent to the preliminary injunction, the district court certified two nationwide subclasses and that the government had not yet sought to appeal that certification. Because the class here is nationwide, and because a nationwide injunction is necessary to provide the class members with complete relief, the panel concluded that the scope of the injunction is appropriate at this juncture, regardless of whether or not it was when originally issued. Thus, the panel concluded that, because the certified class is nationwide and promotes uniformity in administering federal immigration law, the district court did not abuse its discretion as to the scope of the injunction.

Accordingly, the panel denied the motion and directed the Clerk of Court to expedite the appeal.

Dissenting, Judge Bress wrote that the majority's decision is yet the latest example of this court allowing a universal injunction of a clearly constitutional Executive Branch immigration policy. First, as to success on the merits, Judge Bress concluded that the majority erred in concluding that the Proclamation is likely unconstitutional and that it conflicts with the INA and other statutes. Second, Judge Bress concluded that the government established irreparable harm to the interests the Executive seeks to promote through the Proclamation and to the core separation of powers principles that make the Proclamation lawful, and established harm in the form of costs while the injunction remains in effect. Third, as to harm to the opposing party, Judge Bress wrote plaintiffs had not established that their relatives are entitled to visas but for the Proclamation. Fourth, Judge Bress concluded that the public interest strongly supports staying the injunction, stating that the majority added a new, unauthorized stay factor: preservation of the status quo. Judge Bress also wrote that, even if maintenance of the status quo were among the factors that courts consider in this context, the actual status quo is a legal environment in which the Proclamation is authorized.

Finally, as to the scope of the injunction, Judge Bress wrote that the majority's reliance on the district court's recent class certification decision was a concession that the scope of the injunction was invalid when issued. Judge Bress also concluded that the problem with many nationwide injunctions, as here, is that they are premised on class certification orders that are themselves infirm. Further, Judge Bress wrote that this circuit has co-opted the policy of promoting uniform immigration laws as a justification for courts issuing nationwide injunctions of Executive Branch immigration policies.

**COUNSEL**

August E. Flentje (argued), Special Counsel; Courtney E. Moran, Trial Attorney; Brian C. Ward, Senior Litigation Counsel; William C. Peachey, Director; Joseph H. Hunt, Assistant Attorney General; Office of Immigration Litigation, United States Department of Justice, Washington, D.C.; for Defendants-Appellants.

Naomi A. Igra (argued) and Benjamin Gillig, Sidley Austin LLP, San Francisco, California; Esther Sung (argued) and Karen C. Tumlin, Justice Action Center, Los Angeles, California; Nadia H. Dahab and Stephen W. Manning, Innovation Law Lab, Portland, Oregon; Jesse Bless, American Immigration Lawyers Association, Washington, D.C.; Kevin M. Fee and Scott D. Stein, Sidley Austin LLP, Chicago, Illinois; for Plaintiffs-Appellees.

Michael W. Weaver, McDermott Will & Emery LLP, Chicago, Illinois, for Amici Curiae 38 Health Policy Experts.

Xavier Becerra, Attorney General; Michael L. Newman, Senior Assistant Attorney General; Kathleen Boergers and Sarah E. Belton, Supervising Deputy Attorneys General; Srividya Panchalam, Marissa Malouff, and Nimrod Pitsker Elias, Deputy Attorneys General; Office of the General, Oakland, California; Ellen F. Rosenblum, Attorney General; Benjamin Gutman, Solicitor General; Michael C. Kron, Special Counsel; Deanna J. Chang, Senior Assistant Attorney General; Department of Justice, Portland, Oregon; Michael N. Feuer, Corporation Counsel, Oakland, California; Dennis Herrera, City Attorney, San Francisco, California; James R. Williams, County Counsel, Santa Clara, California; Philip J. Weiser, Attorney General, Colorado; Karl A. Racine,

Attorney General, District of Columbia; William Tong, Attorney General, Connecticut; Kathleen Jennings, Attorney General, Delaware; Clare E. Connors, Attorney General, Hawai'i; Kwame Raoul, Attorney General, and Mark A. Flessner, Corporation Counsel, Chicago, Illinois; Aaron M. Frey, Attorney General, Maine; Brian E. Frosh, Attorney General, and Andre M. Davis, City Solicitor, Baltimore, Maryland; Maura Healey, Attorney General, Massachusetts; Dana Nessel, Attorney General, Michigan; Keith Ellison, Attorney General, Minnesota; Aaron D. Ford, Attorney General, Nevada; Gurbir S. Grewal, Attorney General, and Angelo Auteri, Corporation Counsel, Union City, New Jersey; Hector Balderas, Attorney General, New Mexico; Letitia James, Attorney General, and James E. Johnson, Corporation Cousnel, New York, New York; Joshua H. Stein, Attorney General, and Nick Herman, Counsel, Carrboro, North Carolina; Josh Shapiro, Attorney General, and Marcel S. Pratt, City Solicitor, Philadelphia, Pennsylania; Peter F. Neronha, Attorney General, Rhode Island; Thomas J. Donovan Jr., Attorney General, Vermont; Mark R. Herring, Attorney General, Virginia; Robert W. Ferguson, Attorney General, and Peter S. Holmes, City Attorney, Seattle, Washington; Josh Kaul, Attorney General, Wisconsin; for Amici Curiae States and Cities.

Martha Jane Perkins and Sarah Grusin, National Health Law Program, Carrboro, North Carolina, for Amici Curiae National Health Law Program, American Public Health Association, and 48 Other Organizations.

Laura McNally and Neil Nandi, Loeb & Loeb LLP, Chicago, Illinois; Peter S. Margulies, Bristol, Rhode Island; Shoba Sivaprasad Wadhia, University Park, Pennsylvania; for Amici Curiae Immigration Law Professors.

Nicholas Levenhagen and Elizabeth Zirker, Disability Rights California, San Diego, California, for Amici Curiae Disability Rights California, Center for Public Representation, Disability Rights Advocates, Disability Rights Education & Defense Fund, Disability Rights Oregon, National Council on Independent Living, National Disability Rights Network, and The Arc.

Daniel B. Asimov, Arnold & Porter Kaye Scholer LLP, San Francisco, California; John A. Freedman and Jeremy Karpatkin, Arnold & Porter Kaye Scholer LLP, Washington, D.C.; for Amici Curiae CASA, Center for Constitutional Rights, Make the Road New York, and National Immigration Law Center.

Sheryl Garko, Orrick Herrington & Sutcliffe LLP, Boston, Massachusetts, for Amici Curiae American Medical Association, Oregon Medical Association, and American Academy of Pediatrics.

**ORDER**

THOMAS, Chief Judge:

In this case, we consider the government's motion to stay the district court's preliminary injunction enjoining a Presidential Proclamation restricting family-sponsored immigrants from entering the United States without acquiring specified health insurance. We deny the motion. We direct the Clerk of Court to expedite the appeal.

I

The Immigration and Nationality Act ("INA"), Pub. L. No. 82-414, 66 Stat. 163 (1952), allows noncitizens to apply for an immigrant visa to permit them to permanently reside in the United States. 8 U.S.C. §§ 1101(a)(15), 1181(a), 1182(a)(7), 1201(a). Before an individual may apply for an immigrant visa, a prospective employer or a family member who is a United States citizen or lawful permanent resident must file a sponsorship petition on behalf of the individual. *Id.* §§ 1151(a)–(b), 1153. The petition is submitted to and approved by U.S. Citizenship and Immigration Services, which forwards the approved petition to the National Visa Center. *See id.* § 1201. The immigrant must then complete visa processing and schedule an in-person interview before a consular officer at a U.S. embassy or consulate. *See id.* § 1202(a), (e); 22 C.F.R. § 42.62. The consular officer then makes a determination to issue or refuse the visa application. *See* 8 U.S.C. § 1201(a)(1), (g); 22 C.F.R. §§ 42.71, 42.81(a). If an immigrant falls into one of the ten categories enumerated in 8 U.S.C. § 1182(a), they are deemed ineligible for a visa and ineligible for admission into the United States.

Currently, insured status is not one of the criteria for eligibility. *See* 8 U.S.C. § 1182(a).

On October 4, 2019, the President issued the Proclamation in dispute, Proclamation No. 9945, entitled *Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System, in Order to Protect the Availability of Healthcare Benefits for Americans*, 84 Fed. Reg. 53,991. The Proclamation identified the perceived problem of uncompensated medical expenses in the United States, stating, without citation to any source, "data show that lawful immigrants are about three times more likely than United States citizens to lack health insurance." To address this issue, the Proclamation barred, with some exceptions, individuals seeking to enter the United States on an immigrant visa from entering the United States unless they could demonstrate that they will be covered by certain approved health insurance within 30 days of entry or that they have the resources to cover foreseeable healthcare costs. *Id.* at 53,992.

The Proclamation identified a narrow definition of what constitutes "an approved health insurance plan," namely:

> (i) an employer-sponsored plan, including a retiree plan, association health plan, and coverage provided by the Consolidated Omnibus Budget Reconciliation Act of 1985;

> (ii) an unsubsidized health plan offered in the individual market within a State;

> (iii) a short-term limited duration health policy effective for a minimum of

364 days—or until the beginning of planned, extended travel outside the United States;

(iv) a catastrophic plan;

(v) a family member's plan;

(vi) a medical plan under chapter 55 of title 10, United States Code, including coverage under the TRICARE program;

(vii) a visitor health insurance plan that provides adequate coverage for medical care for a minimum of 364 days—or until the beginning of planned, extended travel outside the United States;

(viii) a medical plan under the Medicare program; or

(ix) any other health plan that provides adequate coverage for medical care as determined by the Secretary of Health and Human Services or his designee.

*Id.*

By the terms of the Proclamation, Medicaid does not constitute "approved health insurance" for individuals over the age of 18. *Id.*

The President directed that the Proclamation become effective at 12:01 a.m. eastern daylight time on November 3, 2019. On October 30, Plaintiffs filed this action. The

individual Plaintiffs are seven U.S. citizens who are sponsoring family members for immigrant visas and whose applicant family members have successfully completed the traditional steps for obtaining an immigrant visa, but would be barred from entering the United States under the Proclamation. The organizational Plaintiff is the Latino Action Network, an organization that provides programs aimed at educating and empowering Latinos in Multnomah County, Oregon. The Latino Action Network also provides services to navigate the immigrant visa process.

On November 2, 2019, the district court issued a temporary restraining order precluding the Proclamation from taking effect. *See Doe # 1 v. Trump*, 414 F. Supp.3d 1307 (D. Or. 2019). On November 26, before the expiration of the temporary restraining order, the district court issued a nationwide preliminary injunction prohibiting implementation of the Proclamation. *Doe v. Trump*, 418 F. Supp. 3d 573, 604 (D. Or. 2019). In doing so, the district court applied the familiar *Winter* factors, concluding that the Plaintiffs had shown that (1) they were likely to succeed on the merits; (2) they were likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tipped in their favor; and (4) that a preliminary injunction was in the public interest. *Id.* at 579 (citing *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 22 (2008)). The United States filed this emergency motion to stay the district court order pending appeal.

While this stay motion was pending, on April 7, 2020, the district court certified the following two subclasses:

> **The U.S. Petitioner Subclass**: Individuals in the United States who currently have or will

have an approved or pending petition to the United States government to sponsor a noncitizen family member for an immigrant visa; and whose sponsored family member is subject to the Proclamation and unable to demonstrate to a consular officer's satisfaction that he or she "will be covered by approved health insurance" within 30 days after entry or will be able "to pay for reasonably foreseeable medical costs;" and

**The Visa Applicant Subclass**: Individuals who are foreign nationals who (I) have applied for or will soon apply to the United States government for an immigrant visa; (ii) are otherwise eligible to be granted the visa; but (iii) are subject to the Proclamation and unable to demonstrate to the satisfaction of a consular officer that they "will be covered by approved health insurance" within 30 days after entry or will be able "to pay for reasonably foreseeable medical costs."

## II

A request for a stay pending appeal is committed to the exercise of judicial discretion. *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926). A party requesting a stay pending appeal "bears the burden of showing that the circumstances justify an exercise of that discretion." *Nken v. Holder*, 556 U.S. 418, 433–34 (2009). In considering whether to exercise our discretion in granting the Government's motion to stay the preliminary injunction, we apply the familiar standard set forth by the Supreme Court in

*Nken*, namely: (1) whether the Government has made a strong showing of the likelihood of success on the merits; (2) whether the appellants will be irreparably injured absent a stay; (3) whether a stay will substantially injure other parties; and (4) where the public interest lies. *Id.* at 426. "The first two factors . . . are the most critical." *Id*. at 434. We consider the last two factors if the first two factors are satisfied. *Id.* at 435. We review the scope of the district court's preliminary injunction for abuse of discretion. *California v. Azar*, 911 F.3d 558, 568 (9th Cir. 2018), *cert. denied sub nom. Little Sisters of the Poor Jeanne Jugan Residence v. California*, 139 S. Ct. 2716 (2019).

III

A

*Nken* instructed "that if the petition has not made a certain threshold showing regarding irreparable harm . . . then a stay may not issue, regardless of the petitioner's proof regarding the other stay factors." *Leiva-Perez v. Holder*, 640 F.3d 962, 965 (9th Cir. 2011) (per curium) (citing *Nken*, 556 U.S. at 433–34). We therefore begin our *Nken* analysis with consideration of irreparable harm. *Cf. Al Otro Lado v. Wolf*, 952 F.3d 999, 1007 (9th Cir. 2020) (listing the *Nken* factors and explaining, "We first consider the government's showing on irreparable harm, then discuss the likelihood of success on the merits under the sliding scale approach").

The government has failed to meet its burden of showing irreparable harm. In the context of a stay request, "simply showing some possibility of irreparable injury" is insufficient. *Nken*, 556 U.S. at 434 (citation and internal quotation marks omitted). Rather, at this juncture, the

government has the burden of showing that irreparable injury is likely to occur during the period before the appeal is decided. *Leiva-Perez*, 640 F.3d at 968. The government did not satisfy its burden.

The government first argues that it will suffer irreparable harm because the preliminary injunction prevents "the President from taking action effectuating an Act of Congress." But the question of whether the Proclamation conflicts with congressionally set qualifications for immigrant visas or exceeds the President's authority to change these qualifications is at the core of this dispute, to be resolved at the merits stage of this case. Thus, the harm of such a perceived institutional injury is not "irreparable," because the government "may yet pursue and vindicate its interests in the full course of this litigation." *Washington v. Trump*, 847 F.3d 1151, 1168 (9th Cir. 2017) (per curium), *cert. denied sub nom. Golden v. Washington*, 138 S. Ct. 448 (2017). Indeed, if we were to adopt the government's assertion that the irreparable harm standard is satisfied by the fact of executive action alone, no act of the executive branch asserted to be inconsistent with a legislative enactment could be the subject of a preliminary injunction. That cannot be so.

The government next argues that it will be irreparably harmed during the pendency of the appeal because of the alleged substantial cost to healthcare providers and taxpayers by uninsured immigrants. For support, the government simply cites to the statement in the Proclamation that recent immigrants are three times more likely than citizens to lack health insurance. There is no citation in the Proclamation for this statistic, nor is one to be found anywhere in the record. Nor could the government provide any source for this

assertion in briefing or at oral argument. And the Proclamation contains no further cost quantification.

By contrast, the Plaintiffs placed into the record evidence that uninsured immigrants represent only 0.3% of American adults and only 2.9% of uninsured adults. The record evidence also shows that uninsured immigrants use less than 0.06% of total American medical resources and only 0.08% of emergency service expenditures. These statistics include illegal as well as legal immigrants, so the numbers pertinent here may be considerably lower. The record further indicates that immigrants are more likely to represent "favorable insurance risk[s]" in Affordable Care Act (ACA) marketplaces because they tend to be relatively healthier than the normal insured population and use fewer healthcare goods and services. For instance, in California, immigrants who are insured through an ACA-compliant plan (which, if subsidized, are not permitted under the Proclamation) have 10% lower medical claims than citizen enrollees in the same plans. As a result of excluding low-risk consumers, the overall health of the risk pool will decrease, resulting in increased premiums for all consumers using state marketplaces.

The government claims that we are precluded from reviewing the Proclamation's conclusory findings and must accept them as true. This assertion runs afoul of *Nken*, which places the burden on the government, and instructs us only to exercise our discretion to enter a stay when irreparable harm is probable, not merely possible. 556 U.S. at 434. The government cannot meet this burden by submitting conclusory factual assertions and speculative arguments that are unsupported in the record. *See Azar*, 911 F.3d at 581. In this respect, this Proclamation's findings stand in stark

contrast to the proclamation's findings in *Trump v. Hawaii*, 138 S. Ct. 2392 (2018). That case involved a proclamation that set forth "extensive findings," which the President found after ordering the relevant agencies to "conduct a comprehensive evaluation" of the countries affected by the proclamation, and the proclamation then tailored its findings to the agencies' recommendations. *See id.* at 2408. Thus, in assessing whether the government has met its burden, we must examine and review the entire record, not simply rely on one unsupported conclusory statement. *See Washington*, 847 F.3d at 1162–63.

Even if we credit the Proclamation's assertions, the government has not demonstrated that the healthcare system will be irreparably burdened while this appeal is pending. The record evidence shows that many of the immigrants affected by the Proclamation could obtain some form of insurance that would reduce their already minimal contribution to healthcare costs, but these immigrants are nonetheless inadmissible under the Proclamation because they cannot obtain an "approved" health insurance plan or cannot obtain a plan within the 30-day deadline. In short, the record evidence shows that the impact of uninsured immigrants on uncompensated healthcare costs is minimal, and that many of the affected immigrants could obtain health insurance if permitted to look beyond the plans and 30-day limitation in the Proclamation. The government has submitted no evidence disputing these points.

Further, the harm asserted by the government is purely monetary, and "'monetary injury is not normally considered irreparable.'" *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 993 (9th Cir. 2019) (quoting *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197,

1202 (9th Cir. 1980)).  In addition, monetary injury to third parties, such as health care providers, or to the economy in general provides an even weaker justification for a finding of "irreparable harm."  After all, the *Nken* irreparable harm standard is "whether the *applicant* will be irreparably injured absent a stay."  556 U.S. at 426 (emphasis added).

By contrast, the district court concluded that the evidence demonstrated that Plaintiffs would suffer irreparable harm absent preliminary injunctive relief and that the government was unlikely to succeed in showing otherwise.  *Doe*, 418 F. Supp. 3d at 599.  The Plaintiffs submitted evidence that all seven individual Plaintiffs are either unable to afford an "approved" plan, unable to add the immigrant family member to an existing employer-sponsored plan, unable to acquire an approved plan within the 30-day deadline, or lack the resources to demonstrate they could independently pay for foreseeable medical costs.  *See id.* at 584–86.

The district court concluded that the Proclamation likely would negatively affect approximately 60% of all immigrant visa applicants.  *Id.* at 597.  Plaintiffs aver, citing data from the United States Census Bureau, that approximately 375,000 immigrants each year—primarily those seeking to enter the United States on family-sponsored petitions—would be affected, and potentially precluded from obtaining an immigrant visa, by the Proclamation.

Based on the evidence in the record, the district court found that the approved insurance plans delineated in the Proclamation were "legally or practically unavailable to intending, or prospective, immigrants."  *Id.* at 583.  The district court found that employer-based plans often had a waiting period that exceeded the Proclamation's 30-day

deadline and highlighted the fact that the prohibition against obtaining subsidized insurance under the Affordable Care Act rendered that market, for the most part, inaccessible to arriving immigrants. *Id.* It also highlighted the fact that Short Term Limited Duration Insurance plans, which were among the Proclamation's "approved" plans, are banned in California, and that Oregon's contract term requirements make such plans ineligible under the Proclamation there. *Id.* The district court underscored that reliance on Medicaid for any immigrant over the age of 18 is prohibited by the Proclamation.

As to the other "approved" plans, the district court explained that:

> Family-member plans are only available to applicants younger than 27 years old. Visitor's insurance plans are designed for short-term visits, have caps on individual coverage and lifetime benefits, and often exclude preexisting conditions, mental health conditions, and maternity care. Such plans often result in significant uncompensated care. People who receive insurance through state Medicaid programs may not be able to add their family members to their plan. Catastrophic plans are only available to people who are already legally present. Even then, only people under 30 (or who obtain a special hardship exemption) are eligible to enroll. TRICARE is available only to members of the United States military and their close relatives. Medicare is perhaps the least feasible option—only intending [that]

immigrants older than 65 who have already
been living continuously in the United States
for five years may enroll.

*Doe*, 418 F. Supp. 3d at 583–84.

The district court concluded, based on the record evidence, that the Proclamation would result in prolonged separation from family members, a factor that we have held constitutes sufficient irreparable harm. *Hawai'i v. Trump*, 878 F.3d 662, 699 (9th Cir. 2017), *rev'd on other grounds and remanded*, 138 S. Ct. 2392 (2018); *see also Washington*, 847 F.3d at 1168–69. For example, the district court found that one of the Plaintiffs risks having his wife's I-601A waiver automatically revoked if she is denied a visa at her interview. *See Doe*, 418 F. Supp. 3d at 598. The district court further found that Plaintiffs who have already secured I-601A waivers through their family member sponsors had a high risk of being forced to leave the United States for an indefinite period of time. *Id*. Based on the record, the district court determined that the Plaintiffs were unlikely to acquire one of the "approved health insurance" plans set forth in the Proclamation, but were otherwise likely qualified for entry under § 1182(a). *Id*. In sum, without reciting all of the record evidence, the record amply supported the district court's conclusion that the Plaintiffs would suffer irreparable harm.

Ultimately, the government has failed to sustain its burden of establishing that it would suffer irreparable harm absent a stay of the preliminary injunction pending a hearing by a merits panel. The record supports the district court's conclusion that the Plaintiffs would suffer irreparable harm absent a preliminary injunction.

B

Our *Nken* analysis could conclude here, given that if a stay applicant cannot show irreparable harm, "a stay may not issue, regardless of the petitioner's proof regarding the other stay factors." *Leiva-Perez*, 640 F.3d at 965. However, the context of this case suggests that we should proceed with examining the remaining *Nken* factors.

The second most important *Nken* factor is whether the applicant has made a strong showing of the likelihood of success on the merits. *See Nken*, 556 U.S. at 426. As a motions panel, we must take care not to prejudge the merits of the appeal, but rather to assess the posture of the case in the context of the necessity of a stay pending presentation to a merits panel. *See Washington*, 847 F.3d at 1168. Thus, we will not address the merits in detail, but only as necessary to apply the *Nken* factors. Here, the government has not met the high standard of showing a *strong* likelihood of success on the merits.

1

The government has not shown that it has a strong likelihood of success on the Plaintiffs' claim that the Proclamation conflicts with the Violence Against Women Act's ("VAWA") amendments to the INA. *See* 8 U.S.C. § 1182(a)(4)(E). Indeed, on this claim the government has made no showing at all.

The VAWA amendments exempted from the public charge exclusion certain immigrant relatives of victims of violent crimes, such as felony assault, sexual assault, incest, kidnapping, or human trafficking. 8 U.S.C.

§ 1101(a)(15)(U)(iii).  These amendments also exempted victims of battering and extreme cruelty.  8 U.S.C. § 1154(a)(1)(A)(iii)–(vi).  Congress expressly provided that these immigrants—including the spouses, children, and parents of violent crime victims—were categorically exempt from the financial burden or "public charge" provisions of the INA.  *Id.*

The Proclamation makes no such exemption.  Rather, it effectively prohibits family members of violent crime victims from obtaining visas and joining their families in the United States by declaring them to be financial burdens and ineligible, directly contradicting VAWA.  This preclusion contravenes the well-settled principle that the President's powers are executive, not legislative, in nature.  "[T]he President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952).  The President's authority to act "must stem either from an act of Congress or from the Constitution itself."  *Id.* at 585.  Here, Congress has enacted the VAWA amendments specifically to enable the subject immigrants to qualify for admission and visas, *see* 8 U.S.C. § 1154(a)(1)(A)(iii)–(vi), and "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes."  *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

The government does not respond to the merits of this challenge; it only suggests that the statutory conflict does not affect many people.  Of course, this consideration is irrelevant to the determination of whether the government has demonstrated a strong likelihood of success of prevailing on the VAWA issue.  By contrast, Plaintiffs point out that immigrant family members of victims of violent crimes

comprise at least 20 categories of noncitizens seeking to enter the United States with an immigrant visa. *See* 22 C.F.R. § 42.11.

At this stage, the government has failed to make a strong showing that it is likely to prevail on Plaintiffs' claim that the Proclamation conflicts with the Violence Against Women Act.

2

The government has also not sustained its burden of showing that it has a strong likelihood of success of prevailing on Plaintiffs' claim that the Proclamation violates the ACA. *See* 42 U.S.C. §§ 18021 to 18024, 18031; *see also* 26 U.S.C. § 36B. The government has not submitted any evidence to indicate that it is likely to succeed on this claim.

In enacting the ACA, Congress authorized the creation of state-based markets that present consumers with multiple insurance coverage choices so that consumers can compare and purchase plans in an effort to "increase the number of Americans covered by health insurance and decrease the cost of health care." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2580 (2012). To purchase insurance in a state's marketplace, an individual must prove that they reside in the United States or a territory thereof and that they are "lawfully present." 42 U.S.C. § 18032(f)(1)(A)(ii); 45 C.F.R. § 155.305(a)(1)–(3). To incentivize the purchase of insurance plans through ACA marketplaces, Congress provided premium tax credits to offset the costs of purchasing an insurance plan and expressly extended the availability of those credits to any taxpayer who "is an alien lawfully present in the United States." 26 U.S.C. § 36B(c)(1)(B)(ii).

Despite Congress's clear intent to extend these tax credits to legal immigrants, the Proclamation explicitly excludes such "subsidized plans" from the list of approved health insurance plans.  As a result, an immigrant attempting to legally enter the United States will not have access to ACA tax credits as Congress intended.  *Compare* 84 Fed. Reg. at 53,992 *to* 26 U.S.C. § 36B(c)(1)(B)(ii).  And, unless an immigrant succeeds in searching for, finding, and paying for eligible insurance—which is unlikely—they will not be able to legally immigrate, even if otherwise eligible under the criteria Congress established.

Additionally, the government's contention that an immigrant may satisfy the Proclamation by purchasing a plan that does not include tax credits (i.e., an "unsubsidized" plan) under the ACA is, in practice, nearly impossible, even though such plans are technically "approved" under the Proclamation.  *See* 84 Fed. Reg. at 53,992.  An immigrant may only participate in the ACA marketplace after they have established both their residency and lawful presence, but the immigrant cannot reside in and be legally present in the United States under the Proclamation without first purchasing "approved" health insurance.  *See* 42 U.S.C. § 18032(f)(1)(A)(ii); 45 C.F.R. § 155.305(a)(1)–(3).  The immigrant is consequently left in a Catch-22: they cannot obtain an "approved" unsubsidized insurance plan unless they have been legally admitted, but they cannot be legally admitted unless they have obtained an "approved" insurance plan.  Thus, the Proclamation bars immigrants from accessing subsidized insurance plans despite Congress's express intent to extend those plans to legal immigrants, 26 U.S.C. § 36B(c)(1)(B)(ii), and it essentially prohibits immigrants from obtaining an unsubsidized plan despite such plans being

"approved" under the Proclamation. The government has not seriously contested this claim.

In sum, given that the evidence in the record supports a conclusion that the Proclamation prevents otherwise eligible immigrants from accessing either subsidized or unsubsidized health insurance plans as Congress intended and instead requires them to obtain—if they can—different, lower quality insurance to be eligible for a visa, we conclude that the government has not shown that it is likely to succeed on this claim.

3

The government has also not sustained its burden of showing that it has a strong likelihood of success of prevailing on Plaintiffs' claims that the Proclamation violates the INA. Although we leave a complete analysis of these claims to the merits panel, several of these claims are worthy of discussion at this stage, in light of the serious questions on the merits Plaintiffs raise. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1137 (9th Cir. 2011).

First, the Proclamation is connected in its avowed purpose to the INA's "public charge" provision. That provision states that "[a]ny alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible." 8 U.S.C. § 1182(a)(4)(B)(i). The statute lists various factors that the consular office can consider. Health insurance is not among them.

More importantly, the statute requires that all of the specified factors should be considered in determining whether an applicant should be deemed a financial burden and consequently inadmissible. 8 U.S.C. § 1182(a)(4)(B). The Proclamation eviscerates the statutory scheme by making the acquisition of designated forms of health insurance the sole consideration of whether an applicant should be excluded from consideration for a family visa. *See* 84 Fed. Reg. at 53,992. Any argument contending that the Proclamation complements the public charge statutory scheme is therefore incorrect.

Regarding § 1182(a)(4)(B), we have recognized that this provision establishes "factors [that] are to be considered 'at a minimum,'" but "[o]ther factors may be considered as well, giving officials considerable discretion in their decisions." *City & Cty. of San Francisco v. USCIS*, 944 F.3d 773, 972 (9th Cir. 2019). The Proclamation does not permit any exercise of official discretion, as the enumerated § 1182(a)(4)(B) factors do, but instead imposes an absolute bar on the entry of uninsured immigrants. For instance, one of the individual Plaintiffs has submitted evidence that he could add his wife to his employer's healthcare plan once she obtained a social security card, but social security cards are not mailed quickly enough to meet the 30-day deadline mandated by the Proclamation. Even in this situation, the consular officer has no discretion to consider that the Plaintiff's wife can obtain an approved health insurance plan and that this factor would weigh against finding that she is likely to become a public charge under § 1182(a)(4)(B). Instead the officer must find that she is inadmissible because she cannot obtain this insurance within 30 days. Without the Proclamation, the officer would have the discretion to consider her admissible, as § 1182(a)(4)(B) intended. In sum,

the Proclamation's health insurance requirement supplants the discretion afforded to consular officers in § 1182(a)(4)(B).

Second, the Plaintiffs raise serious questions related to § 1182(f) of the INA. This section of the INA provides that, when "the President finds that the entry of any aliens or any class of aliens into the United States would be detrimental to the interests of the United States," then he may, "for such a period as he shall deem necessary, suspend the entry of all aliens or any class of aliens . . . or impose on the entry of aliens any restrictions he may deem to be appropriate." 8 U.S.C. § 1182(f). Section 1182(f) "exudes deference to the President." *Hawaii*, 138 S. Ct. at 2408. We acknowledge this broad deference, but nonetheless conclude at this juncture, for two reasons, that the Plaintiffs are likely to succeed in refuting the government's contention that § 1182(f) legitimizes the Proclamation: first, the Proclamation's perfunctory time limitations do not comport with the textual limits of § 1182(f); and second, § 1182(f) does not provide the President with limitless power to deny visas to immigrants based on purely long-term economic concerns.

We first consider whether the Proclamation comports with the temporal limitations of § 1182(f) established by the statute itself: that the President has the power to "suspend" the entrance of aliens "for such period as he shall deem necessary."

"[A]s with any statute, 'we look first to its language, giving the words used their ordinary meaning.'" *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 100 (2012) (quoting *Ingalls Shipbuilding Inc. v. Dir., Office of Workers' Comp.*

*Progs.*, 519 U.S. 248 (1997)). Ordinarily, to "suspend" means to "cause to stop temporarily," *Suspend*, MERRIAM-WEBSTER DICTIONARY (2019), or "connotes a deferral till later," *Hawaii*, 138 S. Ct. at 2409 (citation omitted). The Proclamation summarily states that the entrance of "aliens who will burden the healthcare system is hereby suspended," but the mere use of the word "suspend" does not remedy the fact that the Proclamation omits any indication that the health insurance requirement is temporary. *See* 84 Fed. Reg. at 53,992. Instead, the Proclamation ties the putative suspension to the problem of uncompensated healthcare costs, a speculative argument given that this problem has no apparent resolution under the current healthcare system.

By the Proclamation's own terms, it does not have an endpoint. Rather, it only requires periodic status reports and merely provides that if the Secretary of State, after consulting other officials, "determines that circumstances no longer warrant the continued effectiveness of the suspension . . . the Secretary shall immediately advise the President." *See* 84 Fed. Reg. at 53,993. There is no requirement that the President act on the advice. Although § 1182(f) does not require an explicit duration, *see Hawaii*, 138 S. Ct. at 2410, the lack of an explicit time limitation is problematic in light of the absence of any language that suggests even an implicit limitation, such as a limit measured by the occurrence of some future event or condition. The Proclamation here is therefore distinguishable from the Proclamation at issue in *Hawaii*, which "ma[de] clear that its 'conditional restrictions' will remain in force only so long as necessary to 'address' the identified 'inadequacies and risks' within the covered nations." *Id.* To achieve its goal, the *Hawaii* Proclamation established "an ongoing process to engage covered nations and assess every 180 days whether the entry restrictions

should be modified or terminated," and the Proclamation stated that it aimed to "'relax[ ] or remove[ ]' the entry restrictions 'as soon as possible.'" *Id.*

By contrast, the Proclamation here includes no suggestion that the health insurance requirement is temporally limited by anything, including the overall reduction in uncompensated healthcare costs. Although the Secretary of State will review the *effectiveness* of the program in 180 days and, from then on, on a yearly basis, *see* 84 Fed. Reg. at 53,993, there is no language that suggests that the requirement will be removed "as soon as possible," or when any specified circumstance changes. *Cf. Hawaii*, 138 S. Ct. at 2410. Furthermore, unlike the Proclamation in *Hawaii*, which was promulgated after DHS and other agencies "conducted a comprehensive evaluation of every single country's compliance with the information and risk assessment baseline," *id.* at 2408, the Proclamation here was not issued following any sort of comprehensive agency review supported by data-driven analysis. Indeed, the government has submitted no evidence to suggest that the health insurance requirement will reduce uncompensated healthcare costs in such a way as to render the limitation feasibly temporary.

For example, the Proclamation states that uncompensated healthcare costs have "exceeded $35 billion in each of the last 10 years," and suggests that this figure could be lowered by refusing to admit immigrants who lack approved health insurance. *See* 84 Fed. Reg. at 53,991. However, data in the record indicates that uncompensated health care costs have

remained around $35 billion since at least 2001.[1]  As stated above, we credit the Plaintiffs' evidence that uninsured immigrants contribute minimally to this amount.  These facts call into question whether the Proclamation is consistent with the direction to "suspend" immigration for so long as necessary to effectuate the government's goal of decreasing uncompensated healthcare costs.

The Proclamation's longevity is contingent upon the diminishment of uncompensated healthcare costs—costs that have remained stable for at least two decades—which it purports to reduce by restricting entry of a class of immigrants that has been shown not to significantly affect that figure, and whose dollar impact on uncompensated costs will likely remain static, whatever happens to uncompensated costs in general.  Consequently, the likely ineffectiveness of the health insurance requirement suggests that uncompensated care costs will remain high, and the perceived "necessity" of the Proclamation could therefore continue in perpetuity.  *Cf. Hawaii*, 138 S. Ct. at 2410 ("[W]hen a president suspends entry in response to a diplomatic dispute or policy concern, he may link the duration of those restrictions, implicitly or explicitly, to the resolution of the triggering condition.").  In short, the Proclamation's failure to explicitly or implicitly establish any time constraints on the health insurance prohibition raises serious questions as to

---

[1] *See* INSTITUTE OF MEDICINE (US) COMMITTEE ON THE CONSEQUENCES OF UNINSURANCE, HIDDEN COSTS, VALUES LOST 47 (2003) (available at https://www.ncbi.nlm.nih.gov/ books/NBK221662/); *see also* American Hospital Association, Uncompensated Hospital Care Cost Fact Sheet 3 (January 2019) (https://www.aha.org/system/files/2019-01/uncompensated-care-fact-sheet-jan-2019.pdf) (establishing that uncompensated healthcare costs totaled approximately $21.5 billion in 2001, which is roughly $32 billion when adjusted for inflation).

whether the Proclamation is a "suspension" according to the plain meaning of the term in § 1182(f).

We turn now to Plaintiffs' second challenge to the government's arguments concerning § 1182(f)—namely, that the President exceeded even the broad authority prescribed to him in § 1182(f) when he issued the Proclamation. Based on the evidence in the record and the stated objectives of the Proclamation, we conclude that the government is not likely to succeed on this issue either.

We acknowledge that "[b]y its plain language, § 1182(f) grants the President broad discretion to suspend the entry of aliens into the United States." *Hawaii*, 138 S. Ct. at 2408. Nonetheless, the substantive scope of this power is not limitless. The "sole prerequisite set forth in § 1182(f) is that the President 'find[ ]' that the entry of the covered aliens 'would be detrimental to the interests of the United States.'" *Id.* The President satisfied this prerequisite in *Hawaii* because "the entry policy [in the Proclamation was] plausibly related to the Government's stated objective to protect the country and improve vetting processes." *Id.* at 2420. Thus, there, the President acted within the traditional spheres authorized by § 1182(f): in the context of international affairs and national security, and working in tandem with the congressional goals of vetting individuals from countries identified as threats through an agency review. *See id.* at 2409, 2412.

By contrast, the Proclamation here deals with a purely domestic economic problem: uncompensated healthcare costs in the United States. *See* 84 Fed. Reg. at 53,991. We reject the government's argument that the Proclamation implicates the President's foreign affairs powers simply because the

Proclamation affects immigrants. *Cf. E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1279 (9th Cir. 2020) ("Broadly citing to the Rule's immigration context is insufficient to invoke the foreign-affairs exception" so that the President does not have to follow the traditional pathways of public rulemaking.). Therefore, while the "President [may] adopt[ ] 'a preventive measure . . . in the context of international affairs and national security,'" and he is then "'not required to conclusively link all of the pieces in the puzzle before [courts] grant weight to [his] empirical conclusions,'" *Hawaii*, 138 S. Ct. at 2409 (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 35 (2010)), his power is more circumscribed when he addresses a purely domestic economic issue, *see E. Bay Sanctuary Covenant*, 950 F.3d at 1279.

Indeed, in domestic economic matters, the national security and foreign affairs justifications for policy implementations disappear, and the normal policy-making channels remain the default rules of the game. For instance, the "public charge rule" discussed above attempts to resolve similar concerns related to the perceived financial burden of immigrants without resorting to § 1182(f) for justification. *See City & Cty. of S.F.*, 944 F.3d at 779–80 (explaining that the proposed rule interpreting this provision of the INA went through the typical notice-and-comment period under the Administrative Procedure Act). In contrast, the Proclamation here was issued with virtually no factual findings, minimal reasoning, and an extremely limited window for public comment, raising serious questions as to whether the President has effectively rewritten provisions of the INA. We therefore find it unlikely that the government will succeed in its broad reliance on § 1182(f).

Again, we do not prejudge the resolution of the merits of this issue because the question is whether the government has shown a strong likelihood of success on the merits. The Plaintiffs have raised sufficiently serious questions on the merits of their INA claim, including on the government's defenses, that we cannot conclude that the government has sustained its high burden of showing a strong likelihood of success of the merits.

4

The district court issued a lengthy, thoughtful, and forceful opinion focusing on whether the Proclamation violated the nondelegation doctrine. In deference to the merits panel, we decline to address the probable likelihood of success for either party on this claim. *See Washington*, 847 F.3d at 1168.

In addition, the Plaintiffs have raised a number of issues not addressed by the district court, such as the violation of the Administrative Procedure Act, which also may present serious questions on the merits.

C

The third *Nken* factor is whether a stay will substantially injure other parties, on which we touch only briefly given the government's failure to satisfy the two most important *Nken* factors. *See Nken*, 556 U.S. at 435. We have already explained that the plaintiffs have established irreparable injury. *See* Part III.A, *supra*. In addition, the record demonstrates the significant effect of the Proclamation on other parties. Twenty-one states, the District of Columbia, and the City of New York filed amici briefing describing the

significant harm they and other governmental entities will suffer if the Proclamation is allowed to go into effect. These amici explain that immigrants "are vital to the economic, civic, and social fabric of our states and city." Indeed, the evidence in the record indicates that in 2014, immigrant-led households paid more than $26 billion in state and local taxes in California,[2] and $736 million in state and local taxes in Oregon.[3] Plaintiffs and amici provided further evidence credited by the district court to satisfy this factor. *See Doe*, 418 F. Supp. 3d at 599–600 (crediting evidence that the implementation of the Proclamation will interrupt family reunification, detrimentally affect job sectors that disproportionately employ immigrants, and increase the number of underinsured immigrants who will be prohibited from purchasing subsidized ACA insurance plans). The government does not seriously contest this evidence. This factor favors the Plaintiffs.

## D

The final *Nken* factor is where the public interest lies. "The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits. It often happens that this purpose is furthered by the status quo, but not always." *Golden Gate Restaurant Ass'n v. City & Cty. of San Francisco*, 512 F.3d 1112, 1116 (9th Cir. 2008) (quoting

---

[2] Am. Immigration Council, *Immigrants in California* 4 (2017) (https://tinyurl.com/CAP-Immigrants-in-CA).

[3] Am. Immigration Council, *Immigrants in Oregon* (2017) (https://www.americanimmigrationcouncil.org/research/immigrants-oregon).

*Canal Authority of Florida v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974)). In this case, the public interest lies with maintaining the *status quo* while the appeal is pending. For countless decades, a stable immigration system has provided for families to be united through a visa system that did not require purchase of selected insurance products for entry into the United States.

The government contends this factor weighs in its favor because the Proclamation as implemented constitutes the *status quo*, which would be upended if a stay is not issued. But it was the Proclamation that altered the *status quo* for the Plaintiffs, whose family members had qualified for entry under established immigration policy, but are now inadmissible under the Proclamation. The "purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). This observation has even more force here, where we are considering only a stay pending appeal of a *preliminary* injunction. In the government's re-imagining of the *status quo* in this context, this factor would always tip in the government's favor, effectively rendering the Court powerless to exercise its discretion on this factor in such instances.

Given the irreparable harm to the Plaintiffs, the lack of irreparable harm to the United States for maintaining the *status quo* pending resolution of this appeal, and the injury to other parties if the Proclamation is immediately implemented, the public interest favors preserving the *status quo*. This factor falls to the Plaintiffs.

IV

We finally consider the scope of the district court's preliminary injunction.  In this case, the district court determined that a nationwide injunction was appropriate. Based on evidence in the record, the district court concluded that the Proclamation would cause significant harm to 21 states, the District of Columbia, and New York City if allowed to go into effect there.  Accordingly, the court enjoined the Proclamation across the country to preserve uniformity in immigration policies.  *Doe*, 418 F. Supp. 3d at 603.  Subsequently, the district court certified the two nationwide subclasses noted above: the United States Petitioner subclass and the Visa Applicant subclass.  The government has not yet sought to appeal that certification.

In the present procedural posture—a request for a stay pending the appeal of a preliminary injunction—a provisionally certified nationwide class is sufficient justification for a nationwide injunction.[4]  *See Al Otro Lado*, 952 F.3d at 1004 n.4.  Because the class here is nationwide, and because a nationwide injunction is necessary to provide the class members with complete relief, we conclude that the scope of the injunction is appropriate at this juncture, regardless of whether or not it was when originally issued.

"The scope of an injunction is 'dependent as much on the equities of a given case as the substance of the legal issues it presents,' and courts must tailor the scope 'to meet the exigencies of the particular case.'"  *Azar*, 911 F.3d at 584 (quoting *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct.

---

[4] Should the government ultimately prevail in reversing the class certification, then the scope of the injunction should be revisited.

2080, 2087 (2017)).  Here, the balance of the equities tips in favor of protecting the certified class: the government has not shown that it will be irreparably injured absent enforcement of the Proclamation, while the Plaintiffs have shown that the immediate implementation of the Proclamation will affect the long-standing practice of how immigration visas are processed and will prevent class members from reuniting with their families.  Plaintiffs have raised serious concerns that class members will be seriously injured if the Proclamation is implemented immediately, and thus the exigencies of this case indicate that an injunction protecting the certified class is "not more burdensome than necessary" to provide relief while the merits of this case are pending.  *See id.* (citing *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).

In addition, "there is no bar against class-wide, and nationwide relief in federal district or circuit court when it is appropriate," *Bresgal v. Brock*, 843 F.2d 1163, 1170 (9th Cir. 1987), and here the class-wide, nationwide relief is necessary to afford the class members the relief to which they are entitled.  Many of the typical circumstances that counsel against the nationwide scope of an injunction are absent from this case.  No litigation challenging this Proclamation is pending elsewhere, alleviating concerns occasionally associated with nationwide injunctions that such injunctions deprive other courts from offering diverse perspectives on the legal issues while similar litigation is ongoing in multiple forums.  *See Azar*, 911 F.3d at 583.  Moreover, the district court here has not stayed the preparation of this case for trial pending the appeal of the nationwide injunction, removing a consideration that "magnifies" the concerns associated with nationwide injunctions.  *See id.*  The nationwide scope of the injunction is also based on the certified subclasses, which eliminates some concern that a nationwide injunction is

overly burdensome. *Cf. id.* at 582–83 ("[I]njunctive relief generally should be limited to apply only to named plaintiffs were there is no class certification") (quoting *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501 (9th Cir. 1996)).

Further, "[t]he INA was designed to implement a uniform federal policy," *Kahn v. INS*, 36 F.3d 1412, 1414 (9th Cir. 1994), and we have underscored the need for a "comprehensive and unified" immigration policy, *Arizona v. United States*, 567 U.S. 387, 401 (2012); *see also, e.g.*, *Regents of the Univ. of Cal. v. United States Dep't of Homeland Sec.*, 908 F.3d 476, 511 (9th Cir. 2018) ("Allowing uneven application of nationwide immigration policy flies in the face of [uniformity] requirements"); *Hawaii v. Trump*, 878 F.3d 662, 701 (9th Cir. 2017) ("Because this case implicates immigration policy, a nationwide injunction was necessary to give Plaintiffs a full expression of their rights"), *rev'd on other grounds*, — U.S. —, 138 S. Ct. 2392 (2018). The provisions of the INA that are affected by the Proclamation represent the current "national immigration policy, and an injunction that applies that policy to some individuals while rescinding it as to others is inimical to the principle of uniformity." *Regents of the Univ. of Cal.*, 908 F.3d at 512. Consequently, a more limited injunction of the Proclamation would "needlessly complicate agency and individual action in response to the United States's changing immigration requirements," *E. Bay Sanctuary Covenant*, 950 F.3d at 1284, and so the nationwide injunction of the Proclamation is justified.

Thus, because the certified class is nationwide in scope and promotes uniformity in administering federal

immigration law, the district court did not abuse its discretion in entering a nationwide injunction.

## V

In sum, the government has not established the requisite irreparable harm necessary to justify a stay pending appeal. Its rights may be vindicated upon completion of this litigation. The alleged monetary harms to third parties upon which the government relies do not constitute irreparable harm. While that sole factor is dispositive, we also conclude that the government did not meet its high burden to satisfy the other *Nken* factors. It has not demonstrated likelihood of success. Staying the injunction would injure both the plaintiff class and third parties, and the public interest weighs against entering a stay. The preliminary injunction preserves the status quo during the pendency of this appeal. The district court did not abuse its discretion in determining the scope of the preliminary injunction.

For these reasons, we deny the motion to stay the preliminary injunction pending appeal. We do not prejudge the consideration of the merits appeal.

**MOTION DENIED.**

BRESS, Circuit Judge, dissenting:

Today's decision is yet the latest example of our court allowing a universal injunction of a clearly constitutional Executive Branch immigration policy. This time, the President in Proclamation No. 9945 imposed certain

restrictions on the entry of immigrants who, in the President's judgment, will unduly burden the American healthcare system. In what unfortunately has become standard operating procedure, the district court enjoined the Proclamation on a nationwide basis before it could take effect. While declining to endorse the district court's central rationale, my fine colleagues in the majority find a way to justify the district court's decision, while refusing to stay or limit its blanket injunction.

The majority gravely errs in concluding that the Proclamation is likely unconstitutional. There is no legal basis to impose novel and unjustified restrictions on what the Supreme Court has described as "the President['s] sweeping authority to decide whether to suspend entry, whose entry to suspend, and for how long." *Trump v. Hawaii*, 138 S. Ct. 2392, 2413 (2018). The President issued Proclamation No. 9945 based on his constitutional powers and his statutory authority in 8 U.S.C. § 1182(f). The Supreme Court has held that this provision "[b]y its terms" "exudes deference to the President in every clause." *Id.* at 2408. Yet the majority opinion gives deference to everyone *but* the President—the district court, whose analysis was deeply flawed; States who joined an amicus brief and who are not even parties to this case; and plaintiffs' expert, Dr. Leighton Ku, who candidly admits he performed "not an ideal analysis."

It is a bad day for the separation of powers when the Executive—operating at the apex of his constitutional mandate—loses out to players who lack the authority that the Constitution and Congress entrusted to him. And it is an equally bad day for the rule of law when the majority opinion endorses arguments that the Supreme Court expressly rejected two years ago in *Trump v. Hawaii*. As with many

immigration policies, reasonable minds will differ as to whether Proclamation No. 9945 is good or bad policy. But the great policy debates of our time should be resolved in the halls of Congress, the public square, and at the ballot box, not by a district court in Oregon or a three-judge panel in San Francisco. What I know is that Proclamation No. 9945 is valid as a matter of law. And that is what matters here.

The majority's unjustified intrusion on presidential prerogative is, however, only made more problematic by the scope of the injunction that the court allows. The district court, as noted, issued a nationwide injunction, and one that in fact operates worldwide. Injunctions such as this raise many issues, as the Supreme Court has signaled in repeatedly staying lower courts' (and our court's) universal injunctions. *See Wolf v. Innovation Law Lab*, No. 19A960, 2020 WL 1161432 (U.S. Mar. 11, 2020); *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599 (2020); *Barr v. E. Bay Sanctuary Covenant*, 140 S. Ct. 3 (2019); *Trump v. Int'l Refugee Assistance Project*, 138 S. Ct. 542 (2017); *Trump v. Hawaii*, 138 S. Ct. 542 (2017).

Not heeding these signals, the majority allows another universal injunction to remain in place, but with new and unfortunate twists. When the district court enjoined Proclamation No. 9945, it did so without certifying any class. Just recently, however, and many months into this appeal of its injunction, the district court certified two classes, one of persons in the United States and one of "foreign nationals" around the world. The sequence of events here is cause for concern, and the majority's reliance on the belated class certification decision confirms that the district court's universal injunction was not justified when issued. But what the class certification ruling also shows is that the excesses

of universal injunctions stem in large part from a failure to abide by the rigorous requirements for class certification—requirements that the district court unfortunately did not observe.

If there is any solace here, it is that the majority has only denied a stay of the injunction. I hope the merits panel that receives this case will see things differently. But that decision will be issued many months from now, if not longer. There is no reason for the Executive to have his chosen and plainly constitutional Proclamation put on ice in the interim—a delay that inflicts real damage on our constitutional system. For the reasons expressed here and in my prior dissent in this matter, *see Doe #1 v. Trump*, 944 F.3d 1222, 1223–29 (9th Cir. 2019) (Bress, J., dissenting), I would have stayed the district court's injunction. I therefore respectfully dissent.

I

On October 4, 2019, the President issued Presidential Proclamation No. 9945, *Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System, in Order To Protect the Availability of Healthcare Benefits for Americans*. 84 Fed. Reg. 53991 (2019). Invoking the President's authority under 8 U.S.C. § 1182(f) and the Constitution, the Proclamation restricts the entry of certain immigrants who cannot show that, within 30 days of arriving in the United States, they "will be covered by approved health insurance" or "possess[] the financial resources to pay for reasonably foreseeable medical costs." *Id.* at 53992.

The Proclamation is founded on the President's determination that uninsured immigrants impose unwarranted costs on the American healthcare system. The Proclamation references "data show[ing] that lawful immigrants are about three times more likely than United States citizens to lack health insurance," noting the "substantial" burden that the uninsured impose on healthcare providers and taxpayers. *Id.* at 53991. The President found that this burden—which takes the "form of higher taxes, higher premiums, and higher fees for medical services"—has contributed to uncompensated care costs in excess of $35 billion for each of the last 10 years. *Id.* The Proclamation also identified other burdens that the uninsured impose, including "reliance on publicly funded programs" and overreliance on emergency room care, which creates "delays for those who truly need emergency services." *Id.* The President concluded that "[c]ontinuing to allow entry into the United States of certain immigrants who lack health insurance or the demonstrated ability to pay for their healthcare would be detrimental" to the national interest. *Id.*

To address these problems, the Proclamation requires visa applicants to show they "will be covered by approved health insurance . . . within 30 days of the alien's entry into the United States, . . . unless the alien possesses the financial resources to pay for reasonably foreseeable medical costs." *Id.* at 53992. The Proclamation defines "approved health insurance" by reference to a lengthy list of coverage options. *Id.* These include employer-sponsored and retiree plans, family plans, visitor health insurance plans, unsubsidized health plans offered on State exchanges, Medicare, or "any other health plan that provides adequate coverage for medical care as determined by the Secretary of Health and Human Services." *Id.* Plans need not be purchased prior to entry;

rather, the immigrant must only show that he or she will have the required coverage within 30 days of entry.  *Id.*

Enforcement of the Proclamation takes place all over the world at the consular officer level.  An immigrant must "establish that he or she meets [the Proclamation's] requirements, to the satisfaction of a consular officer, before the adjudication and issuance of an immigrant visa."  *Id.* at 53993.  The Proclamation also empowers the Secretary of State to "establish standards and procedures [to] govern[] such determinations."  *Id.*  This review is distinct from other requirements that the law otherwise imposes.  As the Proclamation makes clear, its review process "is separate and independent from the review and determination required by other statutes, regulations, or proclamations in determining the admissibility of an alien."  *Id.*  That would include, for instance, the public charge provisions of the Immigration and Nationality Act (INA).  8 U.S.C. § 1182(a)(4).

Importantly, the Proclamation "shall apply only to aliens seeking to enter the United States pursuant to an immigrant visa."  84 Fed. Reg. at 53992.  The Proclamation thus "does not affect the entry of aliens entering the United States through means other than immigrant visas."  *Id.* at 53993.  That includes persons seeking nonimmigrant visas or refugees.  Nothing in the Proclamation "affect[s] any individual's eligibility for asylum, refugee status, withholding of removal, or protection under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment."  *Id.*

The Proclamation contains various other exceptions as well.  It does not apply to "any alien holding a valid immigrant visa issued before the effective date of this

proclamation," or "any alien under the age of 18, except for any alien accompanying a parent who is also immigrating to the United States and subject to this proclamation." *Id.* at 53992. The Proclamation does not cover "any alien who is the child of a United States citizen or who is seeking to enter the United States pursuant to" specified visas for children. *Id.* Also excepted are business travelers, foreign students, temporary agricultural workers, and various others. *Id.* On a "case-by-case basis," the Secretary of State may exempt from the Proclamation "any alien whose entry would be in the national interest." *Id.* at 53993.

"[W]ithin 180 days" of the Proclamation's effective date and each year thereafter, the Secretary of State, "in consultation with the Secretary of Health and Human Services, the Secretary of Homeland Security, and the heads of other appropriate agencies, shall submit" a report to the President. *Id.* This report must address "the continued necessity of and any adjustments that may be warranted to the suspension and limitation on entry" imposed, as well as "other measures that may be warranted to protect the integrity of the United States healthcare system." *Id.* The Proclamation makes clear that "[i]f the Secretary of State, in consultation with the heads of other appropriate executive departments and agencies, determines that circumstances no longer warrant the continued effectiveness of the suspension and limitation on entry," the President is to be "immediately" advised. *Id.*

Two days before the Proclamation was set to take effect, plaintiffs—a Multnomah County, Oregon advocacy organization and several U.S. citizens with family members seeking visas—obtained a temporary restraining order blocking enforcement of the Proclamation worldwide. On

November 26, 2019, and leading with the non-delegation doctrine, the district court granted plaintiffs' request for a universal preliminary injunction and refused to stay its order. *Doe #1 v. Trump*, 418 F. Supp. 3d 573 (D. Or. 2019). After the government sought a stay of the injunction pending appeal, our court denied the government temporary emergency relief. *Doe #1 v. Trump*, 944 F.3d 1222–23 (9th Cir. 2019); *see also id.* at 1223–29 (Bress, J., dissenting).

Four months after the government sought a stay in this court and three months after we heard argument on that motion (and while the motion was under submission), the district court granted class certification. *Doe #1 v. Trump*, 2020 WL 1689727 (D. Or. Apr. 7, 2020). The district court issued this class certification decision four and a half months after entering its nationwide preliminary injunction, and over five months after entering the temporary restraining order that blocked the Proclamation from taking effect anywhere.

The district court certified two classes under Federal Rule of Civil Procedure 23(b)(2), one covering persons in the United States and one covering persons all over the world:

> (1) *U.S. Petitioner Subclass*:
>
> Individuals in the United States who currently have or will have an approved or pending petition to the United States government to sponsor a noncitizen family member for an immigrant visa; and whose sponsored family member is subject to the Proclamation and unable to demonstrate to a consular officer's satisfaction that he or she "will be covered by approved health insurance" within 30 days

after entry or will be able "to pay for reasonably foreseeable medical costs"; and

(2) *Visa Applicant Subclass*:

Individuals who are foreign nationals who (i) have applied for or will soon apply to the United States government for an immigrant visa; (ii) are otherwise eligible to be granted the visa; but (iii) are subject to the Proclamation and unable to demonstrate to the satisfaction of a consular officer that they "will be covered by approved health insurance" within 30 days after entry or will be able "to pay for reasonably foreseeable medical costs."

*Id.* at \*17. The government's time to seek leave to appeal the district court's class certification decision has not yet expired. Fed. R. Civ. P. 23(f) (45-day deadline "if any party is the United States, a United States agency, or a United States officer or employee sued for an act or omission occurring in connection with duties performed on the United States' behalf").

Today, our court now denies the government's request for a stay pending appeal, allowing the universal injunction to remain in place. The court's decision is quite wrong, and so I respectfully dissent.

## II

The following canonical factors control the government's request for a stay pending appeal:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*City & Cty. of S.F. v. USCIS*, 944 F.3d 773, 789 (9th Cir. 2019) (quoting *Nken v. Holder*, 556 U.S. 418, 433–34 (2009)).

The majority opinion begins with the government's irreparable harm and only later turns to its likelihood of success on the merits, the supposedly "second most important *Nken* factor." Maj. Op. 22. I have elsewhere explained how a tactical deviation from the normal sequence of the stay factors "waters down the merits analysis." *See Al Otro Lado v. Wolf*, 952 F.3d 999, 1022 (9th Cir. 2020) (Bress, J., dissenting). That is the case here, where the government's asserted harms follow from its strong likelihood of success on the merits. *See id.* ("The sequencing of today's opinion can only reflect the majority's implicit acknowledgement that the government's case is strongest where it most matters, namely, the likelihood of success on the merits."). Inversion of the stay factors is a recent trend and one that produces distortion in the stay analysis.

I thus begin, as we usually do, with the merits.

III

A

The majority concludes that the President has likely exceeded his powers on the theory that Proclamation No. 9945 conflicts with statutes that supposedly forbid it, while failing to fall within 8 U.S.C. § 1182(f). This is seriously mistaken.

Under *Trump v. Hawaii*, the government has made a strong showing that Proclamation No. 9945 is a lawful exercise of the President's vast constitutional and statutory powers in this space. I address § 1182(f) first because, in combination with his innate powers under the Constitution, § 1182(f) creates the high-water mark for the President's ability to place limits on who enters this country. Under § 1182(f) and the President's inherent powers, Proclamation No. 9945 is plainly valid.

Section 1182(f) provides:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f).  Just two years ago, the Supreme Court in *Trump v. Hawaii* held that § 1182(f) "exudes deference to the President in every clause" and "grants the President sweeping authority to decide whether to suspend entry, whose entry to suspend, and for how long."  138 S. Ct. at 2408, 2413.  Based on this "broad discretion to suspend the entry of aliens into the United States," the Supreme Court upheld against constitutional and statutory challenges a presidential proclamation suspending entry of persons from specified countries.  *Id.* at 2408.

The "sweeping authority" that justified the proclamation in *Trump v. Hawaii* clearly allows the President to do what he did here in Proclamation No. 9945.  As the Supreme Court has held, the "sole prerequisite set forth in § 1182(f) is that the President 'find[]' that the entry of the covered aliens 'would be detrimental to the interests of the United States.'" *Id.* at 2408 (quoting 8 U.S.C. § 1182(f)).  The President made that finding in Proclamation No. 9945.  84 Fed. Reg. at 53991.  In *Trump v. Hawaii*, moreover, the plaintiffs argued that the proclamation there conflicted with provisions of the INA, which the plaintiffs believed "already specified" Congress's approach to the issue.  *Id.* at 2411.  But the Supreme Court expressly rejected this theory because "[f]airly read," § 1182(f) "vests authority in the President to impose additional limitations on entry beyond the grounds for exclusion set forth in the INA."  *Id.* at 2412.  Proclamation No. 9945 is another such "additional limitation[] on entry." *Id.*  It is therefore plainly valid under § 1182(f), as interpreted by the Supreme Court.

Against all of this, the majority offers two bases for distinguishing *Trump v. Hawaii* and for concluding that the President has likely exceeded his powers under § 1182(f).

But *Trump v. Hawaii* considered and squarely rejected the very arguments that the majority credits.

*First*, the majority concludes that "the Proclamation's failure to explicitly or implicitly establish any time constraints on the healthcare prohibition raises serious questions as to whether the Proclamation is a 'suspension' according to the plain meaning of the term in § 1182(f)." Maj. Op. 31–32. The Supreme Court considered and rejected this same argument in *Trump v. Hawaii*. While the majority opinion complains that Proclamation No. 9945 "does not have an endpoint," Maj. Op. 29, *Trump v. Hawaii* rejected the plaintiffs' argument that a § 1182(f) "suspension" "mean[t] that the President is required to prescribe in advance a fixed end date for the entry restrictions." 138 S. Ct. at 2410. Citing past proclamations, *Trump v. Hawaii* concluded it was sufficient that the proclamation "makes clear that its 'conditional restrictions' will remain in force only so long as necessary to 'address' the identified 'inadequacies and risks' within the covered nations." *Id.* In particular, the Supreme Court noted that the proclamation "establishes an ongoing process to engage covered nations and assess every 180 days whether the entry restrictions should be modified or terminated." *Id.*

The majority here claims that Proclamation No. 9945 is different because it supposedly "omits any indication that the health insurance requirement is temporary." Maj. Op. 29. Indeed, the majority claims the Proclamation lacks "even an implicit" time limitation, "such as a limit measured by the occurrence of some future event or condition." *Id.* at 29. That is an uncommonly unfair reading of the Proclamation. An *entire section* of Proclamation No. 9945 provides for ongoing review of its "suspension" on entry. The

Proclamation requires that a report be submitted to the President on "the continued *necessity of* and any adjustments that may be warranted to the suspension and limitation on entry." 84 Fed. Reg. at 53993 (emphasis added). The first report must be submitted to the President within 180 days of the Proclamation's effective date, and "annually thereafter." *Id.* If "circumstances *no longer warrant* the continued effectiveness of the suspension or limitation on entry," the President must "*immediately*" be advised. *Id.* (emphases added). The review process here is not materially different from the one at issue in *Trump v. Hawaii*. The majority opinion blinks reality in suggesting otherwise.

Instead, the majority claims the Proclamation is not a temporary limitation on entry because while agency officials can advise the President that the suspension is no longer warranted, "[t]here is no requirement that the President act on the advice." Maj. Op. 29. That is a rather remarkable statement. When exercising his vast powers under § 1182(f) and Article II of the Constitution, nothing requires the President to bind himself to the mast and pre-commit to the recommendations of inferior officials. And like the Proclamation here, the proclamation in *Trump v. Hawaii* also did not require the President uncritically to accept the advice of his subordinates. *See* Pres. Procl. No. 99645, 82 Fed. Reg. 45161, 41169–70 (2017) (describing inter-agency "*recommendations* to the President" and stating "the Secretary of Homeland Security may *recommend* to the President the removal or modification of any or all such restrictions and limitations") (emphases added). The majority's insistence that the fatal flaw in the Proclamation is the President's unwillingness to agree in advance to advice he has not yet received reflects an untenable theory of Executive power with no basis in principle or common sense.

Even more unsettling is the majority's determination that Proclamation No. 9945 is not a temporary "suspension" because of its "likely ineffectiveness." Maj. Op. 31. The majority asserts that "the likely ineffectiveness of the health insurance requirement suggests that uncompensated care costs will remain high," so that "the perceived 'necessity' of the Proclamation could therefore continue in perpetuity." *Id.* In other words, the majority concludes that because the Proclamation will not successfully "reduce uncompensated healthcare costs," those costs will remain high, meaning that the Proclamation will continue in effect forever. *Id.* at 30.

The majority's conclusion about the "likely ineffectiveness" of the Proclamation turns on plaintiffs' expert's self-described "not . . . ideal analysis." I will have more to say on that later. What matters here is that the majority's reasoning again defies *Trump v. Hawaii*. The plaintiffs there similarly maintained that a proclamation would not adequately resolve "the President's stated concern." 138 S. Ct. at 2409. In rejecting this view, the Supreme Court could not have been clearer that "a searching inquiry into the persuasiveness of the President's justifications is inconsistent with the broad statutory text [of § 1182(f)] and the deference traditionally accorded the President in this sphere." *Id.* Indeed, the Supreme Court went on, "'[w]hether the President's chosen method' of addressing perceived risks is justified from a policy perspective is '*irrelevant* to the scope of his [§ 1182(f)] authority.'" *Id.* (quoting *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 187–88 (1993)) (emphasis added).

The Supreme Court in *Trump v. Hawaii* in no uncertain terms rebuffed the plaintiffs' effort to "challenge the entry suspension based on their perception of its effectiveness." *Id.*

at 2421. The majority's armchair conclusion about the "likely ineffectiveness" of Proclamation No. 9945 is thus precisely what the Supreme Court told us *not* to do. The Supreme Court reiterated in *Trump v. Hawaii* that "we cannot substitute our own assessment for the Executive's predictive judgments." *Id.* Yet the majority opinion does just that. Today's decision is therefore a serious affront to the core separation of powers principles that *Trump v. Hawaii* reaffirms and reinforces.

The majority's suggestion that the outcome might have been different if the President had engaged in a more "data-driven analysis," Maj. Op. 30, reflects an equally serious misunderstanding of our role. Since when does this court know health policy better than the President of the United States and the other Executive Branch officials whom the Proclamation requires to be involved—the Secretary of State, the Secretary of Health and Human Services, the Secretary of Homeland Security, and "the heads of other appropriate agencies"? 84 Fed. Reg. at 53993. The majority's conclusion that Proclamation No. 9945 is not a time-limited "suspension" on entry is nothing more than a policy disagreement with the Executive on a matter constitutionally and statutorily committed to his authority.

*Second*, the majority concludes that Proclamation No. 9945 likely exceeds the President's § 1182(f) powers because the Proclamation "deals with a purely domestic economic problem: uncompensated healthcare costs in the United States." Maj. Op. 32. Once again, the majority opinion disregards Supreme Court precedent, mischaracterizes the Proclamation, and improperly treads on the President's constitutional and statutory powers. Indeed, no court has ever

adopted the foreign/domestic distinction that the majority tries to engraft onto § 1182(f).

Proclamation No. 9945 places restrictions on the entry of immigrants into this country. For over a century, the Supreme Court has been clear that "[t]he exclusion of aliens is a fundamental act of sovereignty" that "is inherent in the executive power to control the foreign affairs of the nation." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950); *see also*, *e.g.*, *Hawaii*, 138 S. Ct. at 2418; *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) ("[W]e have recognized that judicial deference to the Executive Branch is especially appropriate in the immigration context where officials exercise especially sensitive political functions that implicate questions of foreign relations.") (quotations omitted); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations . . . ."). The majority's notion that the exclusion of persons from this country can be recharacterized as "a purely domestic economic issue," Maj. Op. 33, thus contradicts settled Supreme Court case law.

Given the source of authority that the President invoked, it is therefore unsurprising that Proclamation No. 9945 on its face has an obvious international valence. If it ever goes into effect, the Proclamation will be implemented by consular officials abroad, who must interview aliens seeking visas. 84 Fed. Reg. at 53993; *Notice of Info. Collection Under OMB Emergency Review: Immigrant Health Ins. Coverage*, 84 Fed. Reg. 58199 (2019). The Proclamation allows the *Secretary of State* to "establish standards and procedures governing such determinations." 84 Fed. Reg. 53993. It enables the Secretary of State to exempt aliens from the Proclamation.

*Id.* And it entrusts the Secretary of State with lead responsibility for preparing regular reports to the President. *Id.* The idea that the Proclamation concerns matters "purely domestic," Maj. Op. 33, is clearly belied by the text and intended operation of the Proclamation itself.

There are also obvious reasons why no court has forced a foreign/domestic distinction on § 1182(f). The text of § 1182(f) allows the President to suspend the entry of aliens who "would be detrimental to the interests of the United States"—without defining what those interests may be and without distinguishing between foreign and domestic interests. Many (if not most) immigration policies naturally implicate domestic interests as well as foreign ones. This is to be expected for a provision that governs entry of persons "*into* the United States." 8 U.S.C. § 1182(f) (emphasis added); *see also, e.g.*, Pres. Procl. No. 4865, 46 Fed. Reg. 48107 (1981) (suspending entry to preserve "law enforcement resources" and promote the "welfare and safety of communities" in the southeastern United States).

In fact, many of the INA's express grounds for inadmissibility could be said to involve "domestic" concerns, or even "purely domestic" ones. *See, e.g.*, 8 U.S.C. § 1182(a)(1)(A)(i) (aliens with communicable diseases); *id.* § 1182(a)(1)(A)(ii) (aliens who have not been vaccinated); *id.* § 1182(a)(2)(A) (aliens with a criminal history); *id.* § 1182(a)(4) (aliens who are likely to become public charges); *id.* § 1182(a)(5) (aliens who would disrupt domestic labor markets or wages). Since § 1182(f) "vests authority in the President to impose additional limitations on entry beyond the grounds for exclusion set forth in the INA," *Hawaii*, 138 S. Ct. at 2412, it would be bizarre if § 1182(f)

reflected a foreign/domestic limitation that appears nowhere in the text or structure of the INA as a whole.

This manufactured distinction is also inconsistent with everything the Supreme Court has told us about § 1182(f). That provision "exudes deference to the President in every clause" and "grants the President sweeping authority to decide whether to suspend entry, whose entry to suspend, and for how long." *Hawaii*, 138 S. Ct. at 2408, 2413. The majority's unprecedented effort to recast § 1182(f) wrongly deprives the President of authority that is rightfully his and will lead to endless problems of administration as courts debate whether a given immigration policy is really more foreign or domestic in nature. This is not the § 1182(f) that Congress enacted or that the Supreme Court construed in *Trump v. Hawaii*.

## B

If Proclamation No. 9945 is a valid exercise of § 1182(f), what is the problem? The district court's primary answer was that § 1182(f) was itself an unconstitutional delegation of legislative power to the President. In the district court's view, "[t]here is no 'intelligible principle' provided as to what it means to be 'detrimental,' what the 'interests' of the United States are, what degree of finding is required, or what degree of detriment is required." *Doe #1*, 418 F. Supp. 3d at 590. The majority opinion tellingly declines to endorse this rationale. Maj. Op. 34 its description of the district court's non-delegation analysis as "thoughtful" and "forceful," *id.*, fails to acknowledge—and if anything, compliments—the district court's remarkable departure from settled law.

I addressed the non-delegation issue at some length in my prior dissent at the administrative stay stage. *See Doe #1*, 944 F.3d at 1226–27 (Bress, J., dissenting). But in brief: the district court's non-delegation holding is clearly incorrect. On just two occasions in our country's history has the Supreme Court struck down a congressional statute under the non-delegation doctrine. *See Gundy v. United States*, 139 S. Ct. 2116, 2129 (2019). Section 1182(f) does not present just the third occasion for doing so. That statute "has for decades been the noted source of statutory authority for presidential proclamations involving immigration matters." *Doe #1*, 944 F.3d at 1226–27 (Bress, J., dissenting). It does not suffer from a mortal constitutional defect hiding in plain sight.

Far from lacking an intelligible principle, the Supreme Court in *Trump v. Hawaii* held that "the language of § 1182(f) is clear" and that § 1182(f) is a "comprehensive delegation" of authority to the President. 138 S. Ct. at 2408, 2410; *see also id.* at 2408 ("clear statutory language"); *id.* at 2410 ("clear text"). Section 1182(f), the Supreme Court has told us, reflects "textual limits." *Id.* at 2409. This is not a quarry from which a non-delegation challenge can be mined.

Indeed, the President's power in this area does not derive solely from Congress, because "[t]he exclusion of aliens" is "inherent in the executive power to control the foreign affairs of the nation." *Knauff*, 338 U.S. at 542; *see also Hawaii*, 138 S. Ct. at 2424 (Thomas, J., concurring) ("Section 1182(f) does not set forth any judicially enforceable limits that constrain the President. Nor could it, since the President has *inherent* authority to exclude aliens from the country.") (emphasis in original and citation omitted). That is why "the strict limitation upon congressional delegations of power to

the President over internal affairs does not apply with respect to delegations of power in external affairs." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 636 n.2 (1952) (Jackson, J., concurring); *see also Gundy*, 139 S. Ct. at 2137 (Gorsuch, J., dissenting) ("[W]hen a congressional statute confers wide discretion to the executive, no separation-of-powers problem may arise if the discretion is to be exercised over matters already within the scope of executive power.") (quotations omitted). This was, in fact, the Supreme Court's exact explanation when it rejected a non-delegation challenge to a precursor to § 1182(f). *See Knauff*, 338 U.S. at 542.

Just last Term, the Supreme Court reiterated that it has "almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law." *Gundy*, 139 S. Ct. at 2129 (quotations omitted). Engaging in such second-guessing in the context of a longstanding statute in the area of foreign affairs, as the district court did, would fundamentally reorder our constitutional system. I wish the majority had said this instead of implying that the district court's ruling warranted further consideration in this court.

## C

The majority opinion instead holds that the government has not made a strong showing of success because Proclamation No. 9945 supposedly "conflicts" with: (1) the Violence Against Women Act's (VAWA) amendments to the INA, 8 U.S.C. § 1182(a)(4)(E); (2) the Affordable Care Act (ACA), 42 U.S.C. § 10821, *et seq.*; and (3) the INA's public charge provision, 8 U.S.C. § 1182(a)(4)(B)(i). Maj. Op. 22–28. I list these grounds in the order the majority presents them.

The district court, however, devoted only a few sentences to VAWA. *See Doe # 1*, 418 F. Supp. 3d at 597. The district court did not rely at all on any perceived conflict with the ACA. *See id.* at 597 n.6 ("The Court expresses no opinion at this stage of the litigation about whether the Proclamation also contravenes or overrides various healthcare laws."). And while the district court did rely on a claimed conflict with the public charge provision, allegedly rendering the Proclamation "unconstitutional under separation of powers," *id.* at 593, this was secondary to its central non-delegation theory.

It therefore is apparent that the majority justifies the district court's injunction on quite different legal bases than the district court itself. But any uneasiness with the district court's rationales should have led to the injunction being stayed, not reliance on new rationales with yet more legal deficiencies. Regardless, the majority's central theory that Congress in various enactments foreclosed Proclamation No. 9945, rendering it unconstitutional, is plainly wrong.

1

I begin with the INA's public charge provisions, because on this point the majority once again flouts *Trump v. Hawaii*. The INA renders inadmissible any alien who "is likely at any time to become a public charge." 8 U.S.C. § 1182(a)(4)(A). Consular officers make this determination using a series of non-exhaustive "minimum" factors: age; health; family status; assets, resources, and financial status; and education and skills. *Id.* § 1182(a)(4)(B)(i)(I)–(V). The majority tells us that Proclamation No. 9945 "eviscerates th[is] statutory scheme by making the acquisition of designated forms of health insurance the sole consideration of whether an

applicant should be excluded from consideration for a family visa." Maj. Op. 27.

The majority's "evisceration" theory is wrong. And *Trump v. Hawaii*—which the majority does not mention in this portion of its opinion—tells us why. Nothing in Proclamation No. 9945 "eviscerates" the public charge provision, for the obvious reason that these are simply two different grounds for inadmissibility. One can meet the public charge provisions but not the Proclamation, and vice versa. *See* 84 Fed. Reg. at 53993 (explaining that the review the Proclamation requires "is separate and independent from the review and determination required by other statutes, regulations, or proclamations in determining the inadmissibility of an alien").

In fact, the Supreme Court in *Trump v. Hawaii* rejected the very type of argument the majority adopts. There, the plaintiffs argued that a proclamation nullified parts of the INA because Congress in that statute had already addressed "the problem of aliens seeking entry from countries that do not share sufficient information." 138 S. Ct. at 2411. The Supreme Court held there was no such conflict with the INA because § 1182(f) "vests authority in the President to impose *additional* limitations on entry *beyond* the grounds for exclusion set forth in the INA." *Id.* at 2412 (emphases added); *see also id.* at 2408 ("It is therefore unsurprising that we have previously observed that § 1182(f) vests the President with 'ample power' to impose entry restrictions in addition to those elsewhere enumerated in the INA.") (quoting *Sale*, 508 U.S. at 187).

There is nothing unusual about Proclamation No. 9945 creating an independent—and yes, dispositive—ground for

inadmissibility, when that is the whole point of § 1182(f). What the majority treats as a "violat[ion] of the INA," Maj. Op. 26, is just § 1182(f) of the INA in operation, as *Trump v. Hawaii* makes plain. The majority today simply resurrects the same "cramped" reading of § 1182(f) that *Trump v. Hawaii* rejected. 138 S. Ct. at 2412.[1]

Implicit in the majority's reasoning is the view that each public charge factor must be given some weight, so that if any one consideration is dispositive, it unravels the statutory scheme. This interpretation has no basis in the statute. The INA does not assign the public charge factors any weight among themselves or in relation to independent eligibility requirements. And as we recently explained, the public charge "factors are not exhaustive," and the Executive "may add to them." *City & Cty. of S.F.*, 944 F.3d at 798. "Other factors may be considered as well, giving officials considerable discretion in their decisions." *Id.* at 792; s*ee also id.* at 796 ("[D]ifferent factors have been weighted more or less heavily at different times.").

---

[1] Unsurprisingly, prior proclamations have addressed grounds of inadmissibility that the INA already provided for to some extent. *Compare* 8 U.S.C. § 1182(a)(2)(h) (rendering inadmissible "[a]ny alien who commits or conspires to commit human trafficking offenses"), *with* Pres. Procl. No. 8342, 74 Fed. Reg. 4093 (2009) (barring entry of certain government officials who have "impeded" or "failed to implement" antitrafficking efforts); *compare also* 8 U.S.C. § 1182(a)(3)(E) (rendering inadmissible Nazi-affiliated aliens who "ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion"), *with* Pres. Procl. No. 8697, 76 Fed. Reg. 49277 (2011) (barring entry of any alien who "ordered, assisted, aided and abetted, committed or otherwise participated in . . . widespread or systematic violence" based on protected characteristics).

The majority complains that the public charge statute "lists various factors that the consular office can consider" and "[h]ealth insurance is not among them." Maj. Op. 26. But again, that is the expected result of a statutory scheme that allows the President to impose "additional limitations on entry." *Hawaii*, 138 S. Ct. at 2412. The majority's quarrel is thus really with § 1182(f) itself, not any actual distortion of the INA. There is no conflict between a public charge provision that is "flexible" and "ambiguous," *City & Cty. of S.F.*, 944 F.3d at 798, and a Proclamation premised on the "clear" and "comprehensive delegation" that Congress conferred on the President in § 1182(f), *Hawaii*, 138 S. Ct. at 2408–09.

2

Unlike the district court, the majority's lead point is that Proclamation No. 9945 "conflicts with the Violence Against Women Act's ('VAWA') amendments to the INA." Maj. Op. 22. These amendments provide that the INA's public charge provisions "shall not apply" to an alien who is the victim of certain crimes. 8 U.S.C. § 1182(a)(4)(E); *see also id.* § 1154(a)(1)(A)(iii)–(vi). Once again, the majority fails in its effort to save the district court's injunction.

As an initial matter, no plaintiff in this case claims that their relatives are subject to the VAWA exemption. VAWA is thus irrelevant to this litigation and plaintiffs would lack standing to invoke it. *E.g.*, *Easter v. Am. W. Fin.*, 381 F.3d 948, 962 (9th Cir. 2004); *Halet v. Wend Inv. Co.*, 672 F.2d 1305, 1309 n.2 (9th Cir. 1982). But in any event, the Proclamation does not conflict with VAWA for the obvious reason that a petitioner who meets VAWA's eligibility requirements is not thereby entitled to admission into the

United States. Rather, that person is merely exempted from the public charge limitations. 8 U.S.C. § 1182(a)(4)(E). Nothing in VAWA or the INA requires the President to impose a VAWA-like carve-out on other grounds for inadmissibility, and nothing in the INA imposes such a restriction on the President's broad authority under § 1182(f).

The majority thus badly errs in concluding that the Proclamation "contravenes the well-settled principle that the President's powers are executive, not legislative in nature," because the President cannot "repeal statutes." Maj. Op. 23 (quotations omitted). Such conclusory statements of constitutional law have nothing to do with what the President has done here. VAWA is a limited exception to one ground for inadmissibility, not an overarching limit on the President's expansive authority under § 1182(f) or his independent constitutional powers in this area.[2]

3

The majority also holds that "[t]he government has not submitted any evidence" of likely success on the plaintiffs'

---

[2] I also find unfortunate the majority's attempt to boost its holding by asserting that the government "has made no showing at all" on VAWA and "does not respond to the merits of this challenge." Maj. Op. 22, 23. The district court, as noted, devoted only a few scant sentences to VAWA. Even so, the government expressly argued in this court that the Proclamation did not conflict with VAWA because *Trump v. Hawaii* "rejected this argument, holding that '§ 1182(f) vests the President with 'ample power' to impose entry restrictions in addition to those elsewhere enumerated in the INA.'" Reply Br. 5 (quoting 138 S. Ct. at 2408) (emphasis omitted). Moreover, VAWA is part of the public charge provision and the government has argued at length why the Proclamation does not conflict with that provision as a whole.

assertion that "the Proclamation violates the" Affordable Care Act (ACA). Maj. Op. 24. That is rather harsh, considering that the district court did not reach this issue. *Doe #1*, 418 F. Supp. 3d at 597 n.6. The plaintiffs devoted less than a page of their stay opposition to the ACA, and the government then addressed the issue in its reply brief. All the same, the notion that the Proclamation conflicts with the ACA is manifestly incorrect.

The ACA authorized the creation of State-based health insurance markets, called "exchanges," "where people can shop for insurance, usually online." *King v. Burwell*, 135 S. Ct. 2480, 2487 (2015) (citing 42 U.S.C. § 18031(b)(1)). Under the ACA, "individuals with household incomes between 100 percent and 400 percent of the federal poverty line" may purchase subsidized insurance plans with the help of "refundable tax credits." *Id.* These tax credits are available to "lawfully present" aliens whose incomes are less than 100 percent of the poverty line and who are also ineligible for Medicaid. 26 U.S.C. § 36B(c)(1)(B). Neither subsidized insurance nor Medicaid satisfy the Proclamation's requirements. Under the ACA, consumers can also purchase unsubsidized insurance on State exchanges. 42 U.S.C. §§ 18031(d)(2)(A), 10832(b). Such unsubsidized plans do satisfy Proclamation No. 9945. *See* 84 Fed. Reg. at 53392. In all cases, however, an immigrant must be "lawfully present" and a resident of a State before he can purchase *any* health insurance from that State's exchange, whether subsidized or not. 26 U.S.C. § 36B(c)(1)(B); 42 U.S.C. § 18032(f)(1)(A)(ii); 45 C.F.R. 155.305(a)(1), (3).

The majority claims that because the Proclamation excludes subsidized plans under State exchanges, "an immigrant attempting to legally enter the United States will

not have access to ACA tax credits as Congress intended." Maj. Op. 25. That is a non sequitur. As the majority acknowledges, under the ACA, subsidized plans are only available to individuals "lawfully present" in the United States. 26 U.S.C. § 36B(c)(1)(B); 42 U.S.C. § 18032(f)(1)(A)(ii). The ACA thus does not cover persons who are subject to the Proclamation, who are *not* lawfully present here. Nor does the Proclamation prevent individuals, once they are "lawfully present," from seeking subsidized insurance under State exchanges. And the ACA says nothing about who may or may not enter this country. That Congress has created a benefit for individuals who have "lawfully" entered the United States does not then give persons a right to enter the country to obtain those benefits.

The apparent suggestion in the majority opinion is that the Proclamation will prevent the entry of *all* persons who could then later take advantage of the subsidized plans that the ACA makes available to immigrants who are "lawfully present." But as discussed above, the Proclamation only covers a subset of immigrants. There are many other immigrants, including persons already lawfully present in the United States, who can try to take advantage of subsidized insurance options. And that is to say nothing of the persons who are subject to the Proclamation, who can meet its eligibility requirements, and who can then pursue subsidized health insurance once they arrive. The suggestion that the Proclamation somehow drains an aspect of the ACA of all function is thus obviously not true.

The majority next claims that although immigrants can satisfy the Proclamation by purchasing unsubsidized insurance on State exchanges, because immigrants must be "lawfully present" in the United States to buy such insurance,

these immigrants are placed in "a Catch-22." Maj. Op. 25. By the majority's reasoning, such persons "cannot obtain an 'approved' unsubsidized insurance plan unless they have been legally admitted, but they cannot be legally admitted unless they have obtained an 'approved' insurance plan." *Id.* This theory collapses because the latter part is not true. Under the Proclamation, the immigrant must only show that he "*will* be covered by approved health insurance . . . within 30 days of the alien's entry into the United States." 84 Fed. Reg. 53992 (emphasis added). The majority's "Catch-22" thus relies entirely on a misreading of the Proclamation.

## IV

The government has not only made an overwhelming showing of likely success on the merits, it has also shown that it will be irreparably harmed absent a stay of the district court's injunction. *Nken*, 556 U.S. at 433–34. The majority's determination otherwise depends on it placing plaintiffs' expert and an amicus brief on higher footing than the President of the United States.

## A

The harm that the court's injunction inflicts is irreparable and real—to the interests the Executive seeks to promote through the Proclamation and to the core separation of powers principles that make the Proclamation lawful. The injunction is a severe affront to the President's authority, itself an irreparable injury. *See Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.") (quotations omitted).

The majority downplays the government's institutional injury on the theory that the Proclamation's lawfulness "is at the core of this dispute, to be resolved at the merits stage." Maj. Op. 16.  But by this logic, a court of appeals could never stay a district court's injunction until the merits were finally adjudicated, which is not the law.  The merits of a case of course are at issue at the "merits stage."  But the merits are relevant now too, because we are required to evaluate the likelihood of success on the merits at the stay stage.  *See Nken*, 556 U.S. at 434.  In this case, the "clear statutory language" of § 1182(f) reflects a "comprehensive delegation" of "sweeping authority" to the Executive, *Hawaii*, 138 S. Ct. at 2408, 2413, who Congress entrusted with the important mission of suspending the entry of aliens who "would be detrimental to the interests of the United States."  8 U.S.C. § 1182(f).  The court's deprivation of this fundamental power is an acute institutional injury that is not made more palatable by telling the government it must wait many months, if not much longer, for a final decision on the merits.  *See Maryland*, 133 S. Ct. at 3.

The majority discounts the government's institutional injury on the theory that if such injury were credited, "no act" of the President could be enjoined because "the irreparable harm standard [would be] satisfied by the fact of executive action alone."  Maj. Op. 16.  That is a mischaracterization. The majority can make this suggestion only because it took the stay factors out of order and addressed the harms before the merits.  Where, as here, the government has shown an overwhelming likelihood of success on the merits, enjoining it from enforcing its plainly lawful policy is a constitutionally significant injury.

Institutional injury aside, the government has demonstrated that its inability to enforce the Proclamation pending appeal will cause irreparable harm. *See City & Cty. of S.F.*, 944 F.3d at 806 (finding irreparable harm where "the preliminary injunctions will force DHS to grant status to those not legally entitled to it"). The President determined in Proclamation No. 9945 that immigrants "who have not demonstrated any ability to pay for their" medical care impose significant and unwarranted costs on the American healthcare system. 84 Fed. Reg. 53991. The Proclamation does not apply once an immigrant has been admitted to the United States, so it can never apply to aliens admitted during the pendency of this litigation. *See* 84 Fed. Reg. at 53992–93. The costs they impose while the injunction remains in place are thus unrecoverable, creating irreparable harm. *See California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018).

The scope of the injunction here only confirms both the fact of irreparable harm and its magnitude. The injunction applies worldwide and, by the majority's estimation, "would negatively affect approximately 60% of all immigrant visa applicants" and "375,000 immigrants each year." Maj. Op. 19. This only "prove[s] [the government's] point," confirming that the harm "is not only irreparable, but significant." *City & Cty. of S.F.*, 944 F.3d at 806. Nor is the resulting injury limited to "third parties," as the majority suggests. Maj. Op. 19. The government funds considerable aspects of our healthcare system, and it is undeniable that the uninsured would require the government to "incur some otherwise avoidable financial costs if a stay is denied." *Golden Gate Rest. Ass'n v. City & Cty. of S.F.*, 512 F.3d 1112, 1125 (9th Cir. 2008); *see also Azar*, 911 F.3d at 581

(explaining that "economic harm" is "irreparable" when the government "will not be able to recover monetary damages").

Contrary to the majority opinion, the harms here are also not "purely monetary." Maj. Op. 18. The Proclamation identifies non-monetary harms that the uninsured impose, such as increased strain on "publicly funded programs" and overreliance on emergency rooms, "causing overcrowding and delays for those who truly need emergency services." 84 Fed. Reg. 53991. These too are irreparable harms that cannot be avoided absent a stay of the injunction. *See Golden Gate Rest. Ass'n*, 512 F.3d at 1125 (granting stay because "individuals without health coverage are significantly less likely to seek timely medical care than those with health coverage," and consequently are more likely to "seek emergency treatment" from government-funded hospitals and clinics).

## B

The majority opinion disbelieves the government's asserted harms because while the Proclamation states that "immigrants are about three times more likely than United States citizens to lack health insurance," 84 Fed. Reg 53991," there is, the majority complains, "no citation in the Proclamation for this statistic." Maj. Op.16. This is of a piece with the majority's criticism that the Proclamation lacks "data-driven analysis" or a "further cost quantification" (an apparently technical requirement that the majority opinion leaves undefined). *Id.* at 17, 30. The majority's failure to give the Executive any deference is clear legal error.

A presidential proclamation is not a second-grade math assignment, where a student must "show his work" to get

credit. In *Trump v. Hawaii*, the Supreme Court found it "questionable" whether the President operating under § 1182(f) was in any way required to "explain [his] finding[s] with sufficient detail to enable judicial review." 138 S. Ct. at 2409. But "even assuming that some form of review is appropriate," the Supreme Court still rejected "plaintiffs' request for a searching inquiry into the persuasiveness of the President's justifications," which would be "inconsistent with the broad statutory text and the deference traditionally accorded the President in this sphere." *Id.*

The majority's demand that the government explain the Proclamation's factual findings, Maj. Op. 15–16, is thus directly contrary to the Supreme Court's admonition that the President is "'not required to conclusively link all of the pieces in the puzzle before [courts] grant weight to [his] empirical conclusions.'" *Hawaii*, 138 S. Ct. at 2409 (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 35 (2010)). The Constitution does not require the President to engage in the majority's preferred "data-driven analysis" or "cost quantification," nor does § 1182(f). Maj. Op. 17, 30. The court today thus shows a profound disrespect to the Executive, contrary to precedent. And the majority's token acknowledgement that § 1182(f) "'exudes deference to the President,'" Maj. Op. 28 (quoting *Hawaii*, 138 S. Ct. at 2408), is no substitute for the actual deference owed to the President's findings when those findings are under review.

The majority opinion also errs in attempting to distinguish *Trump v. Hawaii* on the ground that the proclamation at issue there contained "extensive findings" following a "comprehensive" inter-agency review. Maj. Op. 18 (quotations omitted). As discussed above, *Trump v. Hawaii* rejected the premise that these findings were even necessary.

*See* 138 S. Ct. at 2409 (rejecting "plaintiffs' request for a searching inquiry into the persuasiveness of the President's justifications"). Nor did the Supreme Court in *Trump v. Hawaii* suggest that the quantum of findings at issue there represented a constitutional or statutory floor. Instead, *Trump v. Hawaii* referenced prior presidential proclamations that were just several sentences long. *Id.* As was the case with the proclamation in *Trump v. Hawaii* itself, Proclamation No. 9945 is "more detailed" than those. *Id.* The notion that *Trump v. Hawaii* somehow supports today's decision is thus plainly incorrect.

Finally, the majority seriously errs in suggesting that because the government is seeking a stay of an injunction, which is an exercise of the court's "discretion," the government is not entitled to the deference that *Trump v. Hawaii* commands. Maj. Op. at 17. The procedural posture of a case is not a license to disregard the fundamental principle that "'it is not the judicial role . . . to probe and test the justifications' of immigration policies." *Hawaii*, 138 S. Ct. at 2419 (quoting *Fiallo v. Bell,* 430 U.S. 787, 799 (1977)). The court's approach loads the dice against the government any time a district court enjoins a government policy. Simply put, the deference that § 1182(f) "exudes," *id.* at 2408, does not evaporate whenever a single district court has enjoined a presidential policy and the government is seeking a stay.

In any event, for all the court's refusal to accept the Proclamation's determination that immigrants are three times more likely than citizens to lack health insurance, the plaintiffs do not even contest this point. In fact, a report that plaintiffs' own expert authored (which is referenced in his expert materials in this case) makes the very same observation: "[A]lmost half of all immigrants—here defined

as noncitizen immigrants—are uninsured, a level that is about three times higher than for native-born citizens."  Leighton Ku, *Why Immigrants Lack Adequate Access to Health Care and Health Insurance* (Migration Policy Inst., Sept. 1, 2006).

## C

Instead of giving the President any deference, the majority makes some findings of its own and then treats those as authoritative.  Contrary to the Proclamation, the majority tells us there is no irreparable harm because, in fact, "the impact of uninsured immigrants on uncompensated healthcare costs is minimal."  Maj. Op. 18.  For this, the majority relies on only a single source: the declaration of plaintiffs' expert, Dr. Leighton Ku.  *See id.* at 17.  But exuding deference to Dr. Ku is not what the law allows.

Dr. Ku is a professor of health policy.  The only prior expert work he discloses is on behalf of plaintiffs who are challenging various immigration policies from the current presidential administration.  Without any basis at all, Dr. Ku opines that "the President and the State Department, which is charged with implementing the [P]roclamation, failed to conduct a careful and reasoned analysis of the policy."  Dr. Ku criticizes the President for acting "without a reasoned approach to administrative rulemaking," faulting the Executive for "fail[ing] to carefully consider the ramifications of this policy."  Dr. Ku further maintains that "if the President is concerned about reducing uncompensated care as expressed in the [P]roclamation, then it would make more sense to . . . expand[] Medicaid or other forms of health insurance, such as the health insurance marketplaces."  It should go without saying that the Constitution does not

enshrine the unsupported legal opinions and transparent policy preferences of an unelected academic.

The majority's fealty to Dr. Ku is even more remarkable when one examines his conclusion that uninsured immigrants do not burden the American healthcare system. Dr. Ku asks in his declaration: "[W]hat is the value of uncompensated care provided to legally admitted immigrants who might have been affected by this [Proclamation]?" Dr. Ku then admits that "*I am not aware of any information that accurately answers this question*." *Id.* (emphasis added). That is enough to disregard his opinion.

Dr. Ku then proceeds to come up with an answer to the question on his own. But in arriving at the figures that the majority treats as definitive, Maj. Op. 16, Dr. Ku compares "recent immigrants" (those "who entered the U.S. within five years" of 2017) to "not recent immigrants" ("U.S. born-citizens *and immigrants* who have been in the U.S. for five years or more" (emphasis added)). This comparison does not even try to measure the cost of care provided to uninsured immigrants in the United States. No wonder even Dr. Ku in his own declaration "recognize[s] that this is not an ideal analysis."

An expert who has disqualified himself under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), through his own admissions should not be the basis for enjoining a lawful presidential proclamation. If nothing else is clear under the Constitution and Supreme Court case law interpreting § 1182(f), it is that a professor's self-described "not . . . ideal analysis" should not win out over the conclusions of the President. The majority's elevation of Dr. Ku's declaration over the Executive's determinations in

the Proclamation is a radical departure from settled law and a serious threat to the democratic process.

The majority also refuses to give deference to the President based on its determination that "immigrants are more likely to represent favorable insurance risk[s] in [ACA] marketplaces because they tend to be relatively healthier than the normal insured population and use fewer healthcare goods and services." Maj. Op. 17 (quotations omitted). The majority purports to locate this conclusion in "[t]he record" in this case. *Id.*

But what the majority cites on this point, and what it calls "the record," is really just an amicus brief from twenty-one States, the District of Columbia, and New York City, which was submitted in the district court. And what that amicus brief cites are the comments *these same States* submitted in response to a State Department notice describing how the Department would implement the Proclamation. These comments did not disclose any underlying data or undertake any apparent study of immigrant healthcare costs. *See, e.g.*, Covered Cal. Cmt. On DOS-2019-0039-0001 (Oct. 31, 2019), available at: https://www.regulations.gov/document?D=DOS-2019-0039-0241 (California's three-and-a-half page letter). But regardless, it is quite circular for administrative comments that unsuccessfully "urge[d] the withdrawal" of Proclamation No. 9945, *id.*, to wind up as authoritative when cited in the same commenters' amicus brief challenging that very Proclamation.

In short, the majority's determination that the government has not made a showing of irreparable harm depends on its refusal to give the President any deference at all, contrary to precedent.

V

The government has shown an overwhelming likelihood of success on the merits, as well as irreparable harm. These factors are "the most critical" in the stay analysis, and only "[o]nce an applicant satisfies" these factors will the court consider "harm to the opposing party and weighing the public interest." *Nken*, 556 U.S. at 434–35. Considering those third and fourth stay factors only confirms that the court should have issued a stay.

A

The majority opinion strives to create the impression that the named plaintiffs' relatives were on the cusp of entering the United States and that only the Proclamation is holding them back. The majority thus asserts that "[t]he individual [p]laintiffs are seven U.S. citizens" whose "family members have successfully completed the traditional steps for obtaining an immigrant visa." Maj. Op. 12–13. But that is untrue: most of plaintiffs' relatives do not even have visa interviews scheduled and some have not submitted required documentation.[3] The majority further states that plaintiffs' "family members had qualified for entry under established immigration policy." *Id.* at 36. That is also untrue. Nor is there any basis for the majority's scaled back assertion that the named plaintiffs' relatives were "otherwise likely

---

[3] The only exception is the relative of one named plaintiff who received an immigrant visa *after* the district court issued its injunction. Plfs.' Notice of Additional Facts, *Doe #1 v. Trump*, Case No. 3:19-cv-01743-SI (D. Or.), ECF No. 123. But neither the Proclamation nor the district court's injunction now have any bearing on this person. This section will thus discuss only the plaintiffs with any potential future harm, even if that harm is ultimately speculative.

qualified for entry under § 1182(a)" for admission into the United States. *Id.* at 21. With the one exception noted above, *see ante* at 77 n.3, it is entirely speculative whether the named plaintiffs' relatives will meet the numerous eligibility requirements and would be allowed to enter this country at all, regardless of Proclamation No. 9945.

The majority fails to disclose that the named plaintiffs have only received approved I-130 petitions. A United States citizen files an I-130 petition with the U.S. Citizenship and Immigration Services (USCIS) or a consular official, on behalf of a relative who is seeking to become a permanent resident in the United States. 8 U.S.C. § 1154(a)(1)(A)(i); 8 C.F.R. § 204.1(a)(1). Approval of an I-130 petition is "only the first step in the process" toward becoming a lawful permanent resident. *Montoya v. Holder*, 744 F.3d 614, 616 (9th Cir. 2014); *see also Vasquez de Alcantar v. Holder*, 645 F.3d 1097, 1103 (9th Cir. 2011).

Only then, after the alien proceeds through the queue, does the alien apply for a visa and the United States begin its review of any request for admission. *Kerry v. Din*, 135 S. Ct. 2128, 2131 (2015) (plurality op.) ("If and when a petition is approved, the alien may apply for a visa by submitting the required documents and appearing at a United States Embassy or consulate for an interview with a consular officer. Before issuing a visa, the consular officer must ensure the alien is not inadmissible under any provision of the INA.") (citations omitted); *Montoya*, 744 F.3d at 616. As we have recognized, "[t]he wait time for these immigrant visas can be considerable." *Landin-Molina v. Holder*, 580 F.3d 913, 920 n.8 (9th Cir. 2009); *see also Scialabba v. Cuellar de Osorio*, 573 U.S. 41, 50 (2014) (plurality op.) ("All of this takes time—and often a lot of it . . . . A family-sponsored

immigrant may stand in line for years—or even decades—just waiting for an immigrant visa to become available."). There are also myriad reasons why a person may ultimately be denied entry. *See* 8 U.S.C. § 1182(a); 22 C.F.R. § 42.62. The Proclamation, of course, ensures that all these other requirements for admission remain intact.

As the foregoing confirms, approval of an I-130 petition "cannot be the equivalent of inspection and authorization to enter and remain in the United States." *Vasquez de Alcantar*, 645 F.3d at 1103. It "does not confer any change in status." *Id.*; *see also Ngongo v. Ashcroft*, 397 F.3d 821, 823 (9th Cir. 2005). Instead, we have explained, approval of an I-130 petition "does not raise [an] alien's expectations" for permanent residence "above the level of hope." *Montoya*, 744 F.3d at 617 (quotations omitted). The majority therefore errs in suggesting that plaintiffs' relatives were qualified to become lawful permanent residents or were about to reach that status, but for the Proclamation.

The named plaintiffs' declarations only confirm this. When the district court issued its injunction, none of the plaintiffs' relatives had consular interview dates scheduled, and seven such relatives are still awaiting interview dates. *Doe #1*, 2020 WL 1689727, at *6–7. Interviews aside, various plaintiffs were still working to submit the appropriate paperwork to apply for a visa when the injunction was issued. *See* Doe #2 Decl. ¶ 7 ("[W]e are currently working on the collection of information and documents . . . ."); *id.* ¶ 9 ("I will need a joint sponsor in order to complete the affidavit of support section of my parents' immigrant visa."); Doe #3 Decl. ¶ 9 ("[M]y husband and I have been working to gather the documents required for consular processing. Several times, we thought we had all of the paperwork submitted, but

the government then requests additional, and different information from us."); Ramos Decl. ¶ 12 (explaining that she is "in the process of gathering all the documents required by the consulate"). And many months later, at least two of plaintiffs' relatives are still "collecting the necessary information." *Doe #1*, 2020 WL 1689727, at \*6. This only confirms that plaintiffs' relatives are still in the middle of the visa process.

Equally misplaced is the majority's emphasis on certain family members who have received provisional I-601A waivers. *See* Maj. Op. 21. I-601A waivers are available to aliens in the consular visa process who have been unlawfully present in the United States and who are immediate relatives of U.S. citizens. *See* 8 U.S.C. § 1182(a)(9)(B)(i); 8 C.F.R. § 212.7(e). The I-601A waiver was developed to expedite the interview process by allowing applicants "who require a waiver of inadmissibility for unlawful presence to apply for such a waiver in the U.S. before they depart for an immigrant visa interview at a U.S. embassy or consulate abroad." *Romero v. Barr*, 937 F.3d 282, 287 n.2 (4th Cir. 2019) (emphasis added).

The grant of an I-601A waiver, like the approval of an I-130 petition, is thus a prefatory mechanism to facilitate the visa application process. It does not mean that plaintiffs' relatives were "otherwise likely qualified" for admission to the United States. Nor can the majority reasonably maintain that the Proclamation will result in family separation for persons with I-601A waivers. Maj. Op. 21. Once again, because there is no indication that plaintiffs' relatives are otherwise admissible, it is impossible to say that any family separation is due to the Proclamation, as opposed to the numerous other requirements that our immigration laws

impose.  Given that plaintiffs' relatives have not completed the visa process, the Proclamation is not the immediate (or future) cause of any alleged family separation.

Finally, it also is not apparent that plaintiffs' family members will be unable satisfy the Proclamation.  The district court enjoined the Proclamation before it could take effect, allowing no chance for any person to even attempt to satisfy the Proclamation's requirements.  The Proclamation allowed the Secretary of State to "establish standards and procedures" to govern consular officers' application of the Proclamation, 84 Fed. Reg. 53993; due to the injunction, we cannot know how any such guidance would affect consular officers' determinations.

Although the majority claims the plaintiffs "submitted evidence" that their relatives are unable to meet the Proclamation's requirements, Maj. Op. 19,  many of the plaintiffs' declarations provide no details about their finances, the amount of income they or their relatives have available, or the prices of qualifying plans under the Proclamation.  The Proclamation also gives the Secretary of State or his designee the ability to exempt aliens "whose entry would be in the national interest," as determined on a "case-by-case basis." 84 Fed. Reg. 53993.  For all these reasons, it is entirely speculative how the Proclamation will affect anyone who is still going through the immigration process.

In short, the sincere "hope" that plaintiffs' relatives will qualify for legal status is no substitute for actual evidence that plaintiffs' relatives are entitled to visas but for the Proclamation.  On that issue, there is no evidence at all.

B

The majority creates another misimpression in purporting to justify the injunction "based on evidence in the record" that the "Proclamation would cause significant harm to 21 states, the District of Columbia, and New York City if allowed to go into effect there." Maj. Op. 37. The majority tells us that "[t]he *record* demonstrates" the "significant harm" these jurisdictions would suffer if the Proclamation is allowed to go into effect. *Id.* at 34–35 (emphasis added). And the majority opinion further informs us this "*evidence* [was] credited by the district court, and that "[t]he government does not seriously contest this *evidence*." *Id.* at 35 (emphases added).

These statements are, regrettably, quite misleading. The only source for the cited "evidence" is the amicus brief that twenty-one States, the District of Columbia, and New York City filed in the district court. The Supreme Court has instructed that "the stated desires of *amici* are no substitute for a class action, are not evidence in the case, and do not influence our decision; we examine an *amicus curiae* brief solely for whatever aid it provides in analyzing the legal questions before us." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 434 n.16 (1984). The majority opinion violates these fundamental precepts. But it is, unfortunately, more problematic than that.

The "evidence" of "significant harm" to the jurisdictions that joined the amicus brief consists of the following: thousands of persons in these States become lawful permanent residents each year, and immigrants "are vital to the economic, civic, and social fabric of our states and city." Maj. Op. 35 (quotations omitted). These assertions cannot justify the district court's injunction. It is of course true that

immigrants are vital to the economic and cultural life of our States and cities. But by this logic, any federal policy that reduces immigration could be enjoined on that basis, giving States and localities the power to negate federal immigration policy. The acknowledged contributions that immigrants make to our States are thus not grounds for enjoining the Executive Branch from recalibrating immigration rules in line with the President's lawful policy goals. And it cannot be that State or local governments that oppose a presidential policy can have the policy enjoined through the commonplace act of joining a State-led amicus brief.

C

For all the reasons I have set forth, the public interest also strongly supports staying the injunction. *Nken*, 556 U.S. at 434. As we have recognized, the government's interests and the public interest tend to merge since "responsible public officials . . . have already considered" the public interest in enacting the policy at issue. *Golden Gate*, 512 F.3d at 1127. Our review of the public interest is thus "constrained," and "it is beyond our province to evaluate the wisdom" of the Proclamation that the President chose to put in effect. *Id.*

That is the result that the four stay factors require. The majority, however, adds a new, unauthorized stay factor: preservation of the status quo. Maj. Op. 35–36. The majority reasons that the "public interest lies with maintaining the *status quo* while the appeal is pending," and that the status quo is a world without the Proclamation. *Id.* at 36. The majority is wrong on two levels. Circuit precedent is clear that maintenance of a "status quo" is not among the factors that courts consider in resolving a request to stay an

injunction. And even if it were, the majority is wrong on what the status quo is.

In *Golden Gate Restaurant Association v. City and County of San Francisco*, 512 F.3d 1112 (9th Cir. 2008), we granted a motion to stay pending appeal a district court's injunction of a San Francisco ordinance that required employers to make minimum healthcare expenditures to or on behalf of their employees. The employers argued that the City, in seeking a stay of the injunction and reinstitution of its ordinance pending appeal, "must meet a higher standard," because "in [the employers'] view, a stay would change the status quo." *Id.* at 1116. We disagreed. We held that the Supreme Court "did not include preservation of the status quo among the factors regulating the issuance of a stay." *Id.* (quotations omitted). And we noted that "several of our sister circuits, in reviewing preliminary injunctions enjoining implementation of new legislation, have granted motions for stays of those injunctions pending appeal without weighing whether a stay would disturb or preserve the status quo." *Id.* at 1117.

Our decision in *Golden Gate* also demonstrates that the majority misperceives the status quo, even if it were a relevant consideration. As we explained in *Golden Gate*, "granting a stay" of the injunction "would, in a real sense, preserve rather than change the status quo," because "[i]n the absence of the district court injunction" the ordinance "would now be part of the status quo." *Id.* at 1116. The rules governing stays should be no different for an ordinance that requires employers to confer healthcare benefits (*Golden Gate*) than a rule requiring immigrants to demonstrate they will have qualifying health insurance (this case). As in

*Golden Gate*, in the absence of the district court's injunction, Proclamation No. 9945 would be part of the status quo.

The true status quo is thus not a judicially created one. As I previously explained, "while the plaintiffs assume that the status quo is a world without the Presidential Proclamation, . . . the actual status quo is a legal environment in which the President possesses 'sweeping proclamation power in § 1182(f),' *Hawaii*, 138 S. Ct. at 2408 (quotations omitted), and in which Proclamation No. 9945 is therefore authorized." *Doe #1*, 944 F.3d at 1229 (Bress, J., dissenting). A stay "simply suspend[s] judicial alteration of the status quo," *Nken*, 556 U.S. at 429, which is all the government is requesting here.

The majority is therefore wrong to assert that "[i]n the government's re-imagining of the *status quo* in this context, this factor would always tip in the government's favor, effectively rendering the Court powerless to exercise its discretion on this factor in such instances." Maj. Op. 36. That is not correct, because the government must meet the traditional *Nken* factors to earn a stay. *See Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 134 S. Ct. 506, 507 (2013) (Scalia, J., concurring) (explaining that no "accepted standard" "require[s] a court to delay enforcement of a state law that the court has determined is likely constitutional on the ground that the law threatens disruption of the status quo") (quotations omitted). It is instead the majority that is "re-imagining" the status quo and creating a rule that, contrary to *Golden Gate*, would require denying a stay of any injunction that blocks new policies from going into effect, because anything new can always be described as changing the status quo.

## VI

We arrive at last at the scope of the injunction, which applies nationwide and to persons around the world seeking entry into the United States. My view, of course, is that there should be no injunction in the first place. But the extreme scope of the district court's injunction presents new and troubling issues of its own.

In a brief section, the court today blesses the district court's injunction based on a class certification order entered months after the fact and the purported need for uniformity in immigration policy. *See* Maj. Op. 37–40. The majority's approach—and the class certification decision it implicitly endorses—are procedurally and substantively flawed. Nationwide injunctions raise many fundamental questions about the proper use of judicial power. Perhaps for that reason, the Supreme Court has repeatedly stayed such injunctions pending appeal. *See Innovation Law Lab*, 2020 WL 1161432, at *1; *New York*, 140 S. Ct. at 599; *E. Bay Sanctuary Covenant*, 140 S. Ct. at 3; *Int'l Refugee Assistance Project*, 138 S. Ct. at 542; *Hawaii*, 138 S. Ct. at 542. We should have done that ourselves in this case. Today's decision unfortunately reflects yet another example of the misuse of universal injunctions and the misunderstanding of class certification on which they are so frequently premised.

## A

Let's begin with the sequence of events here, which should be cause for concern. When the district court issued its injunction in November 2019, no class had been certified and any putative "class members" were not parties to the case. *See Smith v. Bayer Corp.*, 564 U.S. 299, 313–14

(2011). Under what I had thought was the law of our circuit, nationwide relief is only appropriate where "*necessary* to give prevailing parties the relief to which they are entitled." *Azar*, 911 F.3d at 581 (emphasis in original and quotations omitted); *see also New York*, 140 S. Ct. at 600 (Gorsuch, J., concurring) ("Equitable remedies, like remedies in general, are meant to redress the injuries sustained by a particular plaintiff in a particular lawsuit."); *Zepeda v. INS*, 753 F.2d 719, 728 n.1 (9th Cir. 1983) ("Without a properly certified class, a court cannot grant relief on a class-wide basis.").

The district court's injunction was thus vastly overbroad when issued. At that time, any injunction could at most have extended to the named plaintiffs, because no further injunction would have been necessary to give these plaintiffs relief. *Azar*, 911 F.3d at 581. As I thus wrote many months ago when we were considering the government's request for temporary emergency relief pending appeal, the district court's universal injunction could not stand because it "short-circuits the procedures for class certification by giving thousands of persons not before the court the relief that the class certification process is designed to evaluate." *Doe #1*, 944 F.3d at 1228–29 (Bress, J., dissenting).

Now fast-forward many months later. Months after briefing and argument in this court on the government's motion for stay pending appeal—and nearly half a year after the district court first blocked the Proclamation from taking effect nationwide—the district court issued its class certification decision, certifying nationwide and worldwide classes. *Doe #1*, 2020 WL 1689727, at *17. The majority today relies on this later class certification decision to leave in place the district court's earlier universal injunction. Maj. Op. 37.

This is quite unsettling. The majority's reliance on the district court's recent class certification decision is a concession that until a short time ago, there was no valid basis for the district court to enjoin the Proclamation as to anyone but the named plaintiffs. Maj. Op. 37 ("[T]he injunction is appropriate at this juncture, whether or not it was when originally issued."). Yet when the issue was presented to us four months ago, we refused to stay any portion of the nationwide injunction. *See Doe #1*, 944 F.3d at 1228–29 (Bress, J., dissenting). That, in turn, allowed the district court to catch up to our deliberative process and issue the class certification ruling that supposedly justifies a universal injunction and without which the injunction could not stand.

The problems with this course of events are innumerable. Blocking a presidential policy for many months nationwide, without justification, is no small thing. And by ratifying the scope of the district court's injunction, the majority invites district courts to issue overbroad injunctions up front, only to be followed some months later by the class certification decisions that supposedly undergird them. This has it backwards. The scope of a preliminary injunction should be supported at the time it is issued, not months later and while the injunction is on appeal. The inversion of operations that the court tacitly approves today will only lead to path-dependency in the district courts, creating hydraulic pressure to certify a class in order to justify a previously issued nationwide injunction that is now on appeal. That is not how this process should work. Indeed, the government has not even yet had the opportunity to appeal the district court's class certification ruling, which is now, per the majority's opinion, the linchpin of the district court's injunction. *See* Fed. R. Civ. P. 23(f).

The majority opinion treats the district court's disordered approach as "no harm, no foul" because this is the only case challenging Proclamation No. 9945. The majority tells us that "[n]o litigation challenging this Proclamation is pending elsewhere, alleviating concerns occasionally associated with nationwide injunctions," namely, "that such injunctions deprive other courts from offering diverse perspectives on the legal issues while similar litigation is ongoing in multiple forums." Maj. Op. 38.

But why is there no other case challenging Proclamation No. 9945? The most likely reason is because the district court in this case blocked the Proclamation before it could even take effect. With an all-encompassing injunction in hand, no putative class member had any reason to bring suit elsewhere. Far from showing that the district court's injunction poses no threat to the percolation of legal issues, the absence of parallel litigation on Proclamation No. 9945 confirms that nationwide injunctions can, in fact, stymie the development of legal challenges. *See E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019); *Azar*, 911 F.3d at 583. All of this was made possible by the district court's decision to enjoin the Proclamation first and certify classes many months after the fact.

B

The district court's universal injunction fails not only as a matter of procedure, but on substantive grounds as well. Nationwide injunctions of federal policies are increasingly common yet highly controversial. Some members of the Supreme Court have raised important concerns about them. *See New York*, 140 S. Ct. at 600–01 (Gorsuch, J., concurring); *Hawaii*, 138 S. Ct. at 2425–29 (Thomas, J., concurring). This

case underscores that the problem with nationwide injunctions often lies not merely in their equitable excess, *see New York*, 140 S. Ct. at 600–01 (Gorsuch, J., concurring), but with a failure to take seriously the restrictions on class certification that Rule 23 imposes.  The problem with many nationwide injunctions, in other words, is that they are premised on class certification orders that are themselves infirm.  That is the case here.

Class certification, "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only," is "proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–51 (2011) (quotations omitted).  Most challenges to federal policies like the one before us seek injunctive relief classes under Rule 23(b)(2).  But such classes are still subject to the strictures of Rule 23(a), including the core requirement that a case present "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  That provision requires "not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation."  *Wal-Mart*, 564 U.S. at 350 (emphasis in original and quotations omitted).

The majority states without analysis that the universal injunction here "is also based on the certified subclasses, which eliminates some concern that a nationwide injunction is overly burdensome."  Maj. Op. 38–39.  But even an initial glance at the two classes the district court certified shows that the class certification here was anything but proper.  The first certified class, consisting of persons in the United States

petitioning for a family member to receive an immigrant visa, was defined as follows:

> (1) *U.S. Petitioner Subclass*:
>
> Individuals in the United States who currently have or will have an approved or pending petition to the United States government to sponsor a noncitizen family member for an immigrant visa; and whose sponsored family member is subject to the Proclamation and unable to demonstrate to a consular officer's satisfaction that he or she "will be covered by approved health insurance" within 30 days after entry or will be able "to pay for reasonably foreseeable medical costs"; and

*Doe #1*, 2020 WL 1689727, at *17.

The central problem with this class definition is that whether the Proclamation will have any effect on putative class members depends on two determinations that are highly individualized: (1) whether the class member's relative would be otherwise qualified for an immigrant visa but for Proclamation No. 9945; and (2) whether the class member's relative could satisfy the Proclamation. Classwide injunctive relief under Rule 23(b)(2) is appropriate "only when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart*, 564 U.S. at 360. And commonality under Rule 23(a) "requires the plaintiff to demonstrate that the class members have suffered the same injury." *Id.* at 350 (quotations omitted). "That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that

determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

In this case, this analysis cannot be done on a classwide basis, turning instead on highly individualized determinations about whether a given person would meet the INA's various requirements for eligibility and whether, based on a person's financial, family, medical, and employment situation, he would be able to satisfy the Proclamation. Indeed, the class definition on its face does not even require that the class members' relatives be otherwise qualified for immigrant visas, and it ties class membership to the mere filing of a "petition," which (as the district court acknowledged) is just "[t]he first step" in the visa application process. *Doe #1*, 2020 WL 1689727, at *3. Persons in this situation have not even submitted the required documentation. In fact, the class is not even limited to persons who have "filed" a petition at all, but extends to anyone who "will" file one.

It is no answer, as the district court suggested, *id.* at *12, that plaintiffs in this case are not seeking visa determinations. The premise of this entire lawsuit—and the asserted immediate need for the injunction—is that Proclamation No. 9945 is the "but for" cause preventing plaintiffs' relatives from obtaining immigrant visas. That is why the majority opinion goes to great lengths to assert, albeit inaccurately, that plaintiffs' relatives were "otherwise likely qualified under § 1182(a)" for admission into the United States and had family members who "had qualified for entry under established immigration policy." Maj. Op. 21, 36. Plaintiffs cannot make this point in seeking an injunction, but then ignore it when it comes to class certification.

The district court's second class of "foreign nationals" has, if possible, even more problems under Rule 23. That class is defined as follows:

> (2) *Visa Applicant Subclass*:
>
> Individuals who are foreign nationals who (i) have applied for or will soon apply to the United States government for an immigrant visa; (ii) are otherwise eligible to be granted the visa; but (iii) are subject to the Proclamation and unable to demonstrate to the satisfaction of a consular officer that they "will be covered by approved health insurance" within 30 days after entry or will be able "to pay for reasonably foreseeable medical costs."

*Doe #1*, 2020 WL 1689727, at *17.

The enormity of this class should be apparent: it includes persons in countries all over the world. The same individualized determinations described above for the U.S. class will be necessary for each member of this foreign nationals class, except the determinations will be even more difficult to accomplish when class members applying for admission are located outside this country. In fact, this class is not even limited to persons who have applied for visas, but extends to those who "*will soon apply*"—a term of uncertain scope that requires consideration of yet more individualized issues. It is impossible to know today who, if anyone, will actually benefit from class certification since we do not know who otherwise qualifies for a visa to the United States or who will be unable to satisfy the Proclamation's requirements.

In short, the idea that "class certification" is the incantation needed for a nationwide injunction misses the point that Rule 23 is designed to impose limits on broad relief, not to grease it.  The above discussion is not intended to exhaust the problems with the district court's class certification decision.  But it shows that in this case, the injunction's extraordinary and improper scope depends on a class certification ruling that does not withstand scrutiny under Rule 23.  One suspects that many of the current issues with nationwide injunctions can be traced to misapplications of Rule 23.  That is, at least, the case here.[4]

C

Finally, the majority opinion errs in justifying the district court's universal injunction based on "the need for a comprehensive and unified immigration policy."  Maj. Op. 39 (quotations omitted).  It is of course true that many cases from the Supreme Court and this court emphasize the importance of a uniform immigration policy.  *E.g.*, *Arizona v. United States*, 567 U.S. 387, 401 (2012); *Lemus v. Lynch*, 842 F.3d 641, 649 (9th Cir. 2016).  But the original context of these statements was the interpretation of federal immigration law.  That is true of the lead cases the majority cites as well.  *See* Maj. Op. 39 (citing *Arizona* and *Kahn v. INS*, 36 F.3d 1412, 1414 (9th Cir. 1994)).

---

[4] The majority suggests that "provisional" class certification is a basis for nationwide relief at the preliminary injunction stage.  Maj. Op. 37.  Despite its softer-sounding name, provisional class certification is still governed by the requirements of Rule 23.  *E.g.*, *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1041–42 (9th Cir. 2012); *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234–35 (9th Cir. 1996).  In any event, the district court had not certified a class—provisionally or otherwise—when it entered the injunction in this case.

In more recent times, however, our circuit has co-opted the policy of promoting uniform immigration laws as a justification for courts issuing nationwide injunctions of Executive Branch immigration policies. *See, e.g.*, *East Bay Sanctuary Covenant*, 950 F.3d 1242, 1283–84 (9th Cir. 2020). The fit is not a good one. That there can be an interest in having uniform immigration policies does not mean it is *the courts* that can set those uniform policies. That is a decidedly different question.

Whether Congress intended a uniform policy in statutes like the INA says nothing about whether—when courts are enjoining the immigration policies of democratically elected officials—it is preferable to go big instead of small. Indeed, if uniform immigration policy is the value to be prized above all else, nationwide injunctions will always be necessary, contrary to our cases. *See E. Bay Sanctuary Covenant*, 934 F.3d at 1029 (rejecting the view that a nationwide injunction is appropriate "any time an enjoined action has potential nationwide effects," which "would turn broad injunctions into the rule rather than the exception"). Perhaps unsurprisingly, when we recently invoked the interest in uniform immigration laws in allowing a nationwide injunction, the Supreme Court stepped in and stayed the injunction. *Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1094–95 (9th Cir. 2020), *stay granted*, 2020 WL 1161432, at *1.

In this case, the majority opinion tells us that "a more limited injunction of the Proclamation would needlessly complicate" immigration enforcement, whereas a nationwide injunction "promotes uniformity in administering federal immigration law." Maj. Op. 39–40 (citing *East Bay Sanctuary Covenant*, 950 F.3d at 1284). But it is the

Executive Branch, not the courts, that are charged with enforcing the immigration laws. And in this court, the government maintains it is better policy for the injunction to be narrowed, preferring a more limited enforcement of the Proclamation to none at all. If the scope of an injunction should turn on which approach is superior for "administering federal immigration law," Maj. Op. 39–40, why should our view on that question prevail? It is unfortunate that courts have injected themselves into debates such as this, which are far outside our role and competence.

It is thus somewhat fitting that the majority opinion invokes as authority for the district court's nationwide injunction and the "uniformity of immigration law" rationale our circuit's decision in *Hawaii v. Trump*, 878 F.3d 662 (9th Cir. 2017). Maj. Op. 39 (citing the decision for the proposition that "[b]ecause this case implicates immigration policy, a nationwide injunction was necessary to give Plaintiffs a full expression of their rights"). As the majority must quickly acknowledge, the cited decision was then "*rev'd on other grounds*" by the Supreme Court in *Trump v. Hawaii*, Maj. Op. 39—a decision that vacated our court's nationwide injunction and the very case that confirms Proclamation No. 9945 is a valid exercise of the President's authority. In fact, the referenced decision from this court in the *Trump v. Hawaii* litigation, and this court's discussion of uniformity in immigration law, was handed down after the Supreme Court had already stayed the nationwide injunction in full pending appeal. *Hawaii*, 138 S. Ct. at 542; *Hawaii v. Trump*, 878 F.3d 675, 701 (9th Cir. 2017).

The uniformity we should have pursued is the uniformity of decision with *Trump v. Hawaii*. That would have required

staying in full the district court's improper and overbroad injunction.  Because we do not do so, I respectfully dissent.